Littleton, Judge,
delivered the opinion of the court:
Plaintiff seeks to recover $24,400, which it alleges was wrongfully and illegally assessed against it by the defendant *481 as liquidated damages for its alleged delay in completing various portions of work within certain interim periods specified under a contract, whereby the plaintiff company constructed the piers and abutments for the Pit River Bridge in northern California, at the site of the Shasta Dam.
The erection of this bridge was part of a much larger project undertaken by the Bureau of Reclamation, Department of Interior, known as the Central Valley Project, in the State of California, which was to provide for the storage of water, through the construction of the Shasta Dam, for irrigation purposes and for the development of hydroelectric power. The principal structure for the entire project was the Shasta Dam and Power Plant. The erection of this dam required the relocation of parts of various railroads, highways, and public utility lines, within the area of the dam-site. As a result, in addition to the contract for the construction of the dam itself, various other contracts, including the one here in suit, were entered into by the Bureau of Reclamation, acting for the United States, and hereinafter referred to as the defendant, in order to relocate the above mentioned facilities. In its supervision of the entire project the defendant undertook to coordinate the planning, timing and progress of the work under these various contracts, and the invitation for bids, the specifications, and the contract in this case were prepared and drafted with these things in mind.
The contract in question resulted from the necessity to relocate the main line of the Southern Pacific Railroad and U. S. Highway 99, both of which when relocated would run through an area which was to be the reservoir for the storage of water accummulated by the Shasta Dam. Since the dam would store water in the reservoir to a depth of 500 feet it was necessary by the erection of a bridge to raise the roadbed of the railroad and the highway at least that height above •the ground level. The construction of this bridge which would span the Pit River was a major undertaking, and it was necessary that this work be completed in a comparatively short period of time in order to permit the erection of the Shasta Dam on schedule. The plaintiff’s contract related only to the construction of the abutments and piers for the *482 Pit River bridge structure. Until the relocation of the railroad was completed, operations on the dam and power plant would be restricted to construction work which could be performed without endangering the original roadbed of the railroad. . .
On September 1,1939, the defendant invited bids on a competitive basis, for the construction of the abutments and piers for what has now become known as the Pit River Bridge. The invitation for such bids stated in part as follows:
The work shall be commenced within thirty (30) calendar days after date of receipt of notice to proceed and the various parts of the work shall be completed within periods of time varying from one hundred and twenty (120) to five hundred (500) calendar days from the date of receipt of such notice, as provided in the specifications.
The specifications, drawings, and the standard form of contract, were furnished to bidders with the invitation for bids. The plaintiff, a Nevada corporation with its principal office in San Francisco, California, submitted a bid in response .to this invitation for bids and the specifications referred to, in which bid it alleges that although it agreed to complete all work within 500 days it did not agree to adhere to the interim completion dates referred to in the invitation and specifications. This bid was not introduced into evidence and the parties have stipulated that it was lost or destroyed and could not now be produced. The invitation, the specifications, and the contract, called for completion of all work within 500 days.
The plaintiff’s bid was accepted, and on November 4,1939, the contract for the construction of the abutments and piers was executed. The contract provided that the work was to be commenced and completed in conformity with paragraph 21 of the specifications. These specifications provided in part as follows:
The contractor shall begin work within thirty (30) calendar days after date of receipt of notice to proceed, and shall complete the various parts of the work within the number of calendar days from the date of receipt of notice to proceed, as follows:
*483 Abutments 1 and 2, within one hundred and twenty. (120) calendar days;
Pier 1, within one hundred and eighty (180) calendar days;
Pier 2, within two hundred and twenty (220) calendar days; .
Abutments 3 and 4 and piers 8, 9, and 10, within two hundred and forty (240) calendar days;
Pier 3, within two hundred and eighty (280) calendar days;
Piers 6 and 7, within four hundred (400) calendar days;
Pier 5, within four hundred and fifty (450) calendar days; and
Pier 4, within five hundred (500) calendar days.
The contractor shall at all times during the continuance of the contract prosecute the work with such forces and equipment as, in the judgment of the contracting officer, are sufficient to complete it within the specified periods of time. The contractor’s construction program shall be subject at all times to the approval of the contracting officer. The capacity of the construction plant, sequence of operations, and method of operation shall be such as to insure the completion of the work within the specified periods of time. The contractor’s plant shall be located and operated so as not to interfere with the erection of the superstructure of the bridge.
The invitation for bids and this provision of the specifications are very clear and positive, and the evidence of record shows that the purpose of the defendant in providing for the interim completion dates, as to the various piers and abutments, was to enable the construction of the bridge’s superstructure, under another contract, to proceed in a prescribed manner from both approaches or abutments toward the center piers. This was in keeping with the defendant’s efforts to coordinate all work to be performed under various contracts.
Paragraph 22 of the specifications further provided for the.assessing of liquidated damages in the sum of $100 per day for each day of delay in completing the various portions of the work within the time limitations set forth in paragraph 21 of the specifications, above set forth. The plaintiff did Hot, in its bid or at any time prior to completion of all *484 work, make any specific objection or reservation as to the interim completion dates.
Notice to proceed under the contract was issued by the defendant’s contracting officer on December 8, 1989, and received by plaintiff on December 9, 1939. However, the plaintiff had actually commenced work under the contract on November 16, 1939. The written notice to proceed expressly fixed specific dates in conformity with paragraph 21 of the specifications for the completion of the various abutments and piers. Finding 15. The various portions of the work were completed as shown in Finding 16. It is the failure of the plaintiff to complete abutments 1 and 2, and piers 2 and 3, within these interim time limitations, as thereafter extended by the contracting officer, which gave rise to this law suit. Findings 16 and 24.
Article 9 of the contract provided in part as follows:
* * * That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appea.1 as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
*485 Upon the plaintiff’s failure to complete the specified portions of its work within the interim completion dates, the contracting officer assessed liquidated damages from time to time, as called for by the contract, for each day of delay and withheld the amounts so computed from payments made to plaintiff during the progress of the work. The plaintiff filed protests to such actions by the contracting officer under the above provision, objecting to the assessment of the liquidated damages, and requesting that time extensions be allowed because of severe weather conditions. By a change order the contracting officer had previously allowed 25 additional days for the completion of abutments 1 and 2. On October 15, 1940, the contracting officer issued findings of fact which extended the time for the completion of each of the various piers and abutments an additional 17 days. Finding 16. These extensions were based on delays caused by the severe weather conditions which existed from December 1939 through April 1940. See Findings 17-22. The plaintiff appealed to the head of the department (Finding 23) on the basis of these findings, alleging that the extensions of time allowed by the contracting officer were not adequate. On August 8, 1942, the contracting officer’s findings were affirmed (Finding 23) by the head of the department.[1] The plaintiff continued in its efforts to secure what it believed to be adequate time extensions and once again filed objections with the contracting officer. In these later requests the plaintiff in addition to calling attention to the heavy rainfall asserted, for the first time, that its work had been delayed by the interference of another contractor, the failure of the defendant to supply aggregate for the mixing of concrete when requested by the plaintiff, and a carpenters’ strike. In answer to these objections the contracting officer on November 7,1942, issued findings of fact (Finding 24) which permitted the following additional extensions of time:
(a) For completing abutments Nos. 1 and 2, no additional time.
*486 (b) For completing pier 1, fourteen. (14) calendar days’ additional time.
(c) For completing pier 2, three (S) calendar days’ additional time.
(d) For completing abutments Nos. 3 and 4, and piers 8, 9, and 10, twelve (12) calendar days’ additional time.
(e) For completing pier 3, twenty-five (25) calendar days’ additional time.
(f) For completing piers 6 and 7, no additional time.
(g) For completing pier 5, no additional time.
(h) For completing pier 4, forty-nine (49) calendar days’ additional time.
These extensions were based on weather conditions which prevailed subsequent to April 1940, and the carpenters’ strike which the contracting officer found delayed plaintiff’s progress. Plaintiff’s other claims were found to be without merit. Finding 24.
Plaintiff then filed a motion requesting a reconsideration by the department head of his decision of August 8, 1942, which affirmed the contracting officer’s findings of October 15, 1940. At the same time plaintiff appealed from the contracting officer’s findings of November 7, 1942. On July 3, 1943, the head of the department once again affirmed the •findings of the contracting officer, and dismissed the appeal. Finding 25.
The plaintiff then filed a motion for a reconsideration of this decision. This resulted in the decision of October 11, 1945, by the head of the department, in which he concluded, upon an interpretation of the contract, that the plaintiff was not bound by the interim completion dates, and held that since plaintiff had completed all work under the contract within the 500 days as extended, all liquidated damages should be remitted. Nothing in this decision altered the findings which had been made by the contracting officer as to the facts of delay, which findings had been previously affirmed, as above mentioned. Finding 27.
However, the Comptroller General refused to remit the sum of $24,400, which had been withheld as a result of the plaintiff’s failure to complete abutments 1 and 2, and piers 2 and 3, within the completion dates as extended and revised *487 by the contracting officer. Plaintiff then instituted this suit to recover that amount.
The plaintiff contends (1) that the decision of the head of the department of October 11, 1945, which ruled that all liquidated damages be remitted, was final and conclusive under the terms of the contract and binding on this court under United States v. Wunderlich, 342 U. S. 98; (2) that if such decision is not binding, this court should nevertheless hold, as a matter of law, that the plaintiff was not bound by the interim completion dates; and (3) that if the decision is not a final and conclusive one, and if the plaintiff is held to be bound by the interim completion dates, then the court, upon looking to all the facts of record and to the merits of the plaintiff’s claims, should hold that on the evidence presented all delays which resulted were excusable under the terms of Article 9 of the contract and not chargeable to the plaintiff.
Defendant alleges (1) that the decision of October 11, 1945, by the head of the department was based on a question of law, that is, an interpretation of the contract; is not a final and conclusive one within the meaning of Article 9 of the contract, and is not, therefore, binding on this court: and (2) that since that decision is not binding, the prior decisions of the head of the department which considered and affirmed the contracting officer’s findings of fact were final and conclusive, within the terms of Article 9, and binding on this court under the principle of the Wunderlich case, supra.
The Wunderlich case, supra, held that if the parties agree that the decision of the head of the department shall be final and conclusive on questions of fact, such agreement precludes the courts from going behind that decision in the absence of a showing of arbitrariness or acts approaching conscious wrong doing on the part of the defendant.
The plaintiff, in urging that the October 1945 decision of the department head is final and conclusive under the contract, attempts to show that what was decided by that ruling was really nothing more than a fact question, i. e., that as a matter of fact the plaintiff excepted from its bid compliance with the interim completion dates and hence it *488 did not as a matter of fact agree to them. We cannot agree with this contention. A reading of the administrative head’s decision of October 11, 1945, shows quite clearly (Finding 27) that this decision was based on an interpretation of the contract, and, therefore, comes within the classification of a determination of a question of law. As such, it was not the type of ruling made final by the contract or one to which the Wunderlich limitation could attach. It was not a final and conclusive decision under Article 9 of the contract which gives finality to a decision by the head of the department only as to “facts of delay.” Rogers v. United States, 99 C. Cls. 393, 408; Callahan Construction Co. v. United States, 91 C. Cls. 538, 616.
Having held that the October 1945 decision of the department head is not final and conclusive, the next issue presented is whether, as a matter of law, the plaintiff was bound by the interim completion dates. Plaintiff contends that it is not bound by those dates because it excepted compliance therewith from its bid, and that as a result it was the intention of both parties at the time the bid was accepted that those time limitations were not to apply. The record does not support this claim. All that appears is that the plaintiff in its bid stated that it would complete all work within 500 calendar days. It made no exception as to the interim completion dates. We think plaintiff’s bid was consistent with the invitation for bids and paragraph 21 of the specifications, and that plaintiff so intended at the time it filed its bid, and that both parties so intended when they executed the contract.' Defendant meets this allegation of plaintiff with the assertion that it is the contract which is to govern and since the interim completion dates are included in it, the plaintiff is bound by them regardless of what its bid may have contained.
Because of the plaintiff’s failure to produce the bid, and on the evidence presented, we have found, as a fact, that no exception to the interim completion dates was made by the plaintiff in its bid. Finding 6.
Even in the absence of such a finding, we believe that the plaintiff is bound by the interim completion dates because *489 (1) of their inclusion in the invitation for bids, the specifications, and the executed contract; and (2) the acts of the parties throughout the performance of the contract and the facts of record in this case support the conclusion that the plaintiff took no exception to such completion dates, and from the beginning believed itself bound by the interim time limitation.
The terms and conditions of the contract and not the preliminaries to its execution, must govern the rights of the parties. Manufacturers’ Casualty Insurance Co. v. United States, 105 C. Cls. 342, 352. No basis has been shown for a reformation of the contract. If the bid and contract are contradictory, the contract, if not ambiguous, must control.
The notice to proceed called the contractor’s attention to the interim dates and fixed specific dates for completion of the various abutments and piers. The plaintiff acknowledged receipt of this notice to proceed and did not question the listing of the completion dates as being in any way contrary to its bid, or the contract. Throughout the course of the work, plaintiff referred to these dates when requesting extensions of time (Finding 21), and did not at any time prior to the opinion of October 11, 1945, question the right of the contracting officer or the head of the department to apply them, on the ground that it was not bound thereby. Acts of the parties under a contract prior to the time when the contract becomes subject to controversy, are to be given considerable weight in interpreting the contract, A. K. Chahroudi v. United States, 124 C. Cls. 792, and cases there cited.
Included in the decision of October 11, 1945, was the conclusion by the head of the department that the provision in the contract permitting the assessment of liquidated damages was in the nature of a penalty clause and hence invalid. In support of this, the decision pointed to the absence of any proof of actual damages on the part of the defendant. In a case such as this, proof of actual damage is not necessary. However, it is quite apparent here that the various abutments and piers would have to be completed on schedule in order to permit the construction of the bridge’s superstructure to *490 proceed as planned. The relocation of the railroad, which depended on the completion of the bridge, was required before full scale construction work on the dam itself could proceed. Coordination of the planning, timing and progress of the work under the contracts on the project was of vital importance to the defendant. Defendant’s representatives on numerous occasions called the plaintiff’s attention to its slow progress and the adverse effect that it would have on the other contracts which were based upon the anticipated completion of plaintiff’s work. Finding 18. The contractor for the Shasta Dam became concerned over the slow progress of the plaintiff and notified the defendant that failure to have the bridge completed as planned would result in his claiming damages from the defendant. His satisfactory-progress depended on completion of the bridge as scheduled.
The planned coordination of all work under the various contracts would make it difiicult, if not impossible, to determine what actual damage might result if delays were encountered. The circumstances were therefore appropriate for the inclusion of a liquidated damage provision in the contract. Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 662. The absence of proof of actual damage is not sufficient of itself to defeat the validity of a provision for liquidated damages. Weathers Bros. Transfer Co. v. United States, 109 C. Cls. 310, 320.
Defendant contends that if we find, as we have, that the October 1945 decision of the administrative head is not final and conclusive under Article 15 of the contract we must then, under Article 15, look to his prior decisions in both of which he affirmed the contracting officer’s findings of fact. The defendant urges that those decisions, since their ruling as to the facts was not altered by the subsequent decision, constituted the head of the department’s final and conclusive decision within the terms of Article 9 and, under the Wunderlich principle, binding on this court.
The plaintiff, on the other hand, asserts that if we fail to accept the October 1945 decision as final and conclusive then there is no decision of the administrative head at all, and we are free to look to the merits of the plaintiff’s claims *491 unaffected by any findings which, the contracting officer or head of the department may have made. Plaintiff argues in support of this view that when it sought a reconsideration of the prior decisions of the head of the-department, it resubmitted the entire matter once again for his decision; that as a result of this reconsideration, the decision of October 11, 1945, which supplanted any and all prior rulings and must stand in the record of this case as the only remaining effective ruling by the head of the department. Plaintiff would have us accept that decision or none at all.
We cannot agree with this position. The contracting officer charged the plaintiff with delays which he did not find to be excusable under Article 9 of the contract. That article set forth the procedure which was followed by the plaintiff in objecting to the refusal of the contracting officer to grant what it believed to be adequate time extensions. It provided that an appeal could be taken to the head of the department “whose decision on such appeal as to the facts of delay and extension of time for completing the work shall be final o,nd conclusive on the parties hereto.” (Italics supplied.) Thus, under this article the decision of the head of the department was to be one based on a consideration of the “facts of delay” and it was only a decision as to those facts which he was entitled to make with any finality. The October 1945 decision was not one as to the “facts of delay” and was, therefore, not a decision within the meaning of Article 9. The head of the department had the privilege,, if he so desired, of interpretating the contract, but his only ruling, as contemplated by Article 9, was his prior decisions which upheld and affirmed the contracting officer’s findings as to the facts. We must accept those rulings as being the decision of the head of the department, within the meaning of Article 9.
Under Wunderlich, we are bound by the prior decision of the head of the department which upheld the contracting officer’s findings, to the effect that adequate time extensions had been granted for all delays found to be excusable under Article 9 of the contract. Those findings of the contracting officer are supported by substantial evidence, and there does *492 not appear in the record any of the circumstances which might free the plaintiff from the limitation of the rule announced in United States v. Wunderlich, supra. Plaintiff’s petition is therefore dismissed.
It is so ordered.
Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court having considered the evidence, the report of Commissioner William E. Day, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The work required by the contract in suit was a part of a project undertaken by the Bureau of Reclamation, Department of the Interior, known as the Central Valley Project, in the State of California, for storage of water for irrigation purposes and for the development of hydroelectric power. The Central Valley Project extends from a radiant north of the State of California to Bakersfield, California, a distance of approximately 550 miles. About two-thirds of the irrigable land of the Central Valley lies in the San Joaquin or southern portion of the Valley whereas approximately two-thirds of the precipitation falls in the Sacramento or northern portion of the Valley. The project entailed the construction of facilities to store the excess water in the northern part of the Valley and distribute it to the irrigable lands in the southern portion of the Valley, as well as the development of an enormous block of hydroelectric power for the area.
The primary or key structure for the entire project was the erection of Shasta Dam and Power Plant, the cost of which was estimated at approximately 36 million dollars. Construction of Shasta Dam required the relocation of parts of various railroads, highways, public utility lines, etc., within the Shasta dam-site area. The construction of Shasta Dam and Power Plant, as well as other construction incident to or necessitated by the erection of the dam, was performed under specifications and contracts issued and executed by R. F. Walter, Chief Engineer of the Bureau of *493 Reclamation, as contracting officer, and was supervised in the field by Ralph Lowry, construction engineer, as the contracting officer’s representative at the site.
The Bureau undertook to coordinate the planning, timing and progress of the work under the various relocation contracts with the construction of Shasta Dam, as hereinafter more specifically noted.
2. Construction of Shasta Dam required the relocation of the main line of the Southern Pacific Railroad for a distance of approximately 37 miles from the town of Redding, California, northward to Delta, California. Prior to the construction of Shasta Dam, the Southern Pacific Railroad going north after leaving Redding was located along and adjacent to the Sacramento River to the north end of the contemplated reservoir near Delta, a distance of about 37 miles. Since the completed Shasta Dam would store water in the reservoir to a depth of about 500 feet, it was necessary to relocate the railroad at least that distance above its original location. The relocated railroad crossed the Pit River about four miles above the confluence of the Sacramento and Pit Rivers, about ten miles upstream from the location of the dam, and approximately 16 miles, by U. S. Highway No. 99, north of the town of Redding.
The relocation of the railroad, built at a cost of approximately 23 million dollars, was a major undertaking which had to be completed in a comparatively short period of time in order to permit the erection of Shasta Dam on schedule. The major structure on the relocation was the Pit River Bridge, the construction of which was very carefully scheduled to permit work to proceed on the balance of the relocation and on the dam. At the time of its construction, the Pit River Bridge was the highest double-deck bridge in the world and is regarded as one of the major bridges of the world. Carrying the main line of the Southern Pacific Railroad on its lower deck and U. S. Highway No. 99 on its upper deck, it spans the Pit River at a height of some 500 feet. The largest steel girders ever to be shipped to the' West Coast up to that time were used in its construction. The work of constructing the piers and abutments and the work *494 of fabricating and erecting the superstructure were performed under separate contracts. The work on the piers and abutments for the bridge was the work required by the contract now in suit.
3. Specifications for the construction of Shasta Dam and Power Plant were issued by the Bureau calling for receipt of bids by June 1, 1938. A contract for the work required under these specifications, at an estimated consideration of approximately 36 million dollars, was awarded to Pacific Constructors, Inc., under date of July 6, 1938, calling for completion within 2,000 calendar days after date of receipt of notice to proceed. The contract and specifications further provided that until the construction of the relocation of the Southern Pacific Railroad north from Redding, California, was completed and trafile rerouted over the relocated railroad, the contractor’s operations on the dam and power plant would be limited to the construction work which could be performed without endangering the roadbed of the railroad. The specifications further provided that the relocated railroad was to be constructed under a separate contract and that the tentative construction program for Shasta Dam was based upon an assumption that the construction of the relocated railroad would be completed before September 1,1941, and that the Government would make every reasonable effort to secure the completion of the relocated railroad within the time stated.
4. By this action the plaintiff seeks to recover liquidated damages in the sum of $24,400 which were withheld by the defendant from payments made under the contract in suit.
5. On September 1,1939, the defendant, acting through the Bureau of Reclamation, Department of the Interior, hereinafter referred to as the Bureau, invited bids for the construction of abutments and piers for the Pit River Bridge. The invitation for bids, which is in evidence as Commissioner’s exhibit No. 1, states in part as follows:
The work shall be commenced within thirty (30) calendar days after date of receipt of notice to proceed and the various parts of the work shall be completed within periods of time varying from one hundred and twenty (120) to five hundred (500) calendar days from *495 the date of receipt of such notice, as provided in the specifications.
Liquidated damages for delay will be one hundred dollars ($100) per day for each uncompleted part of the work for which a separate period of time for completion is provided in the specifications.
Bids must be submitted upon the standard Government form of bid (Standard Form No. 21) and the successful bidder will be required to execute the standard Government form of contract for construction (Standard Form No. 23).
The right is reserved, as the interest of the Government may require, to reject any and all bids, to waive any informality in bids received, and to accept or reject any items of any bid, unless such bid is qualified by specific limitation.
6. The plaintiff submitted a bid in response to such invitation, presumably on Standard Form 21, although such bid was not introduced in evidence. The court, on motion made by the plaintiff, issued a Call upon the Department of the Interior for the bid. The bid; was not furnished by such Department, and at the trial it was stipulated that the bid furnished by the plaintiff to the defendant had been destroyed and therefore could not be provided.
The foregoing explanation concerning the bid is made because the plaintiff contends that by its bid, although agreeing to complete all work within 500 days, it did not agree to complete the various parts of the work within the time stated in the specifications.
In the absence of proof of an exception to the specification completion dates, it is found as a fact that no exception to such completion dates was made in the plaintiff’s bid.
7. On November 4, 1939, the plaintiff, .a Nevada corporation, with its principal office in San Francisco, California, entered into a contract, No. 12r-10788, with the defendant, acting through the Bureau of Reclamation, for the construction of the piers and abutments for the Pit River Bridge. The contract provided that the plaintiff would perform the work described in the specifications at stated unit prices amounting to a total estimated contract price of $i,138,288. *496 The contract further provided that the work should be commenced and should be completed as provided in paragraph 21 of the specifications. The contract and specifications are in evidence as plaintiff’s exhibits Nos. 1 and 2, and are hereby made a part of this finding.
8. Paragraph 21 of the contract specifications relating to commencement, prosecution, and completion of the work, provides as follows:
The contractor shall begin work within thirty (30) calendar days after date of receipt of notice to proceed and shall complete the various parts of the work within the number of calendar days from the date of receipt of notice to proceed, as follows:
Abutments 1 and 2, within one hundred and twenty (120) calendar days;
Pier 1, within one hundred and eighty (180) calendar days;
Pier 2, within two hundred and twenty (220) calendar days;
Abutments 3 and 4 and piers 8, 9, and 10, within two hundred and forty (240) calendar days;
Pier 3, within two hundred and eighty (280) calendar days;
Piers 6 and 7, within four hundred (400) calendar days;
Pier 5, within four hundred and fifty (450) calendar days; and
Pier 4, within five hundred (500) calendar days.
The contractor shall at all times during the continuance of the contract prosecute the work with such forces and equipment as, in the judgment of the contracting officer, are sufficient to complete it within the specified periods of time. The contractor’s construction program shall be subject at all times to the approval of the contracting officer. The capacity of the construction plant, sequence of operations, and method of operation shall be such as to insure the completion of the work within the specified periods of time. The contractor’s plant shall be located and operated so as not to interfere with the erection of the superstructure of the bridge.
9. Paragraph 22 of the contract specifications relating to liquidated damages provides as follows:
The damages that may result from any delay in comr pletion of the work by the time agreed upon will be¡ *497 difficult, if not impossible, of ascertainment. If any part of the work for which a separate period of time for completion is specified in paragraph 21 is not completed on or before the date fixed for its completion by the terms of the contract, the contractor shall pay to the Government, as fixed, agreed, and liquidated damages, the sum of one hundred dollars ($100) per day for each such uncompleted part of the work for each calendar day’s delay until the work is satisfactorily completed or until such time as the Government may reasonably procure the completion of the work by another contractor or complete the work itself. Whatever sums may be due as liquidated damages for delay may be deducted from payments due to the contractor or may be collected from the contractor or the contractor’s surety or sureties. The provision for liquidated damages shall not prevent the Government from terminating the right of the contractor to proceed in case of default, as provided in article 9 of the contract.
10. Article 9 of the contract relating to delays and damages provides as follows:
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall *498 not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto. [Italics supplied.]
11. Article 15 of the contract relating to disputes provides as follows:
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
12. Article 13 of the contract relating to other contracts provides as follows:
_ The Government may award other contracts for additional work, and the contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under other contracts as may be directed by the contracting officer. The contractor shall *499 not commit or permit any act which will interfere with the performance of work by any other contractor.
13. The defendant invited bids for the construction of the superstructure of the Pit Eiver Bridge (on the abutments, and piers to be constructed under the contract in suit by the plaintiff), calling for the receipt of bids on January 16, 1940. On February 10,1940, the defendant, acting through the Bureau of Reclamation, entered into a contract for such superstructure with another contractor. This contract and specifications provide in part as follows:
* * * The roadway for the relocated railroad to the ends of the bridge and the abutments and piers for the bridge are being constructed under separate contracts which provide for the completion of the various parts of the work within the number of calendar days after date of receipt by the contractor under these specifications of notice to proceed, as follows:
Railroad roadway to south end of bridge, within 49. calendar days.
Abutments 1 and 2, within 40 calendar days.
Pier 1, within 90 calendar days.
Pier 2, within 130 calendar days.
Pier 3, within 190 calendar days.
Railroad roadway to north end of bridge, within 275 calendar days.
Abutments 3 and 4, and piers 8, 9, and 10, within 275 calendar days.
Piers 6 and 7, within 310 calendar days.
Pier 5, within 360 calendar days.
Pier 4, within 410 calendar days.
14. The four abutments and ten piers to be constructed under plaintiff’s contract were numbered in consecutive order from the south to the north of the bridge. Abutments 1 and 2 were at the south approach to the bridge, and abutments 3 and 4 formed the north approach of the bridge. Pier 1 was the first pier on the south end of the bridge, and pier 10 was the first pier at the north entry of the bridge. The main channel of the Pit River flowed between the two large piers, Nos. 3 and 4. Construction of the abutments and piers as well as that of the superstructure was carefully planned to secure completion of the various segments of the work in a prescribed sequence from both approaches toward *500 the central piers. Construction of each abutment and pier by the limiting dates fixed in the contract and specifications was necessary in order that erection of the superstructure could proceed from both approaches over the abutments and piers to complete the superstructure by joining the work from the two approaches with the erection of the high span over the main channel of the river between piers 3 and 4. Work on erection of the superstructure was started and carried on prior to the completion of all piers under plaintiff’s contract.
15. Notice to proceed on the contract in suit was issued by the defendant on December 8,1939, and received by the plaintiff on December 9, 1939. The notice to proceed advised plaintiff that it should begin work within 30 calendar days after receipt of notice and should complete each part of the work within the specified number of calendar days from the date of receipt of notice as provided in paragraph 21 of the specifications. Keceipt of notice to proceed on December 9, 1939, fixed the following completion dates for the specific divisions of the work required under plaintiff’s contract:
(a) Abutments 1 and 2 (120-day period) as April T, 1940.
(b) Pier 1 (180-day period) as June 6, 1940.
(c) Pier 2 (220-day period) as July 16, 1940.
(d) Abutments 3 and 4, and Piers 8,9 and 10 (240-day period) as August 5,1940.
(el Pier 3 (280-day period) as September 14, 1940.
(f) Piers 6 and 7 (400-day period) as January 12, 1941.
(g) Pier 5 (450-day period) as March 3,1941.
(h) Pier 4 (500-day period) as April 22,1941.
16. The plaintiff commenced work under its contract on November 16, 1939, prior to receipt of notice to proceed. Various parts of the work were not completed within the time required by paragraph 21 of the specifications. The contracting officer, as progress payments were being made to the plaintiff, imposed and withheld liquidated damages at the rate of $100 per calendar day for each day of delay on the various parts of the work in accordance with paragraph 22 of the specifications. The plaintiff, by letter, requested the remission of liquidated damages, stating in May *501 and July of 1940 that the delay was not due to any tardiness or neglect to prosecute the work but solely to unavoidable conditions wholly beyond its control occasioned by act of God in the creation of severe weather conditions which prevailed during the winter of 1939-40.
By Change Order No. 1, the contracting officer allowed 25 additional days for the completion of abutments Nos. 1 and 2. The reason for this extension of time is not apparent from the record. By findings of fact of the contracting officer dated October 15, 1940, relating to delays in performance, the contracting officer extended the time for the performance of each of the various parts of work by an additional 17 calendar days due to the unusually severe weather conditions prevailing from December 1939 to April 1940.
By findings of fact dated November 7,1942, pertaining to delay in completion of the contract, the contracting officer granted the following extensions of time for the completion of the various parts of the contract work:
(a) For completing abutments Nos. 1 and 2, no additional time.
(b) For completing pier 1, fourteen (14) calendar days’ additional time.
(c) For completing pier 2, three (3) calendar days’ additional time.
(d) For completing abutments Nos. 3 and 4, and piers 8, 9, and 10, twelve (12) calendar days’ additional time.
(e) For completing pier 3, twenty-five (25) calendar days’ additional time.
(f) For completing piers 6 and 7, no additional time.
(g) For completing pier 5, no additional time.
(n) For completing pier 4, forty-nine (49) calendar days’ additional time.
Liquidated damages were remitted for the delays as to which extensions of time were found to be excusable under Article 9 of the contract. Liquidated damages in the sum of $24,400 for 244 days of delay on abutments 1 and 2 and piers 2 and 3, which were not found to be excusable under Article 9 of the contract by the contracting officer, have been retained. The following table shows the original contract completion *502 date, the extension of time given for each division of'the work, the actual completion date for each schedule, and the number of days of delay on each segment of the work for which liquidated damages were retained.

17. Payment was made under final payment voucher on November 15, 1941, to which voucher there was attached a release on the contract with the following exception noted:
* * * except our claim respecting the inadequacy of the time allowance for the winter of 1939-40; a right to protest the time yet to be allowed for the winter of 1940 — 41 and our claims heretofore filed with the Bureau under date of October 18,1941.
Liquidated damages in the sum of $40,200 for failure to meet prescribed contract completion dates were deducted during the life of the contract, and the final voucher and estimate itemized the schedules upon which liquidated damages were withheld.
18. During the winter and spring of 1939-40, plaintiff’s progress was so slow that Government representatives were very concerned over the possibility that plaintiff would be unable to complete the various schedules within the contract dates and that plaintiff’s slow progress would adversely affect other contracts which were based upon the anticipated completion of plaintiff’s work within the time and in the sequence prescribed in paragraph 21 of the specifications. The Contractor of the Shasta Dam was concerned over plaintiff’s slow progress since his satisfactory progress depended on completion of the bridge on schedule. He informed the Bureau representatives that failure to have the *503 bridge completed as planned would result in Ms claiming damages from the Government. Government representatives called numerous conferences with plaintiff’s representatives at the site in an effort to have plaintiff expedite its work, bring in necessary equipment, complete its batching plant, and work- on days on which other contractors in the area were gainfully employed. Plaintiff’s operations during the period from December 1939 to April 1940 were impeded, in some measure, by heavy rainfall. The site of the work was within an area in which heavy localized rainfall was the normal condition and was reasonably to be anticipated at that time of the year. Rainfall in the winter of 1939-40 was above average. However, plaintiff’s unsatisfactory progress was also due to inadequate equipment, failure to work on days when other contractors were gainfully employed, and failure to expedite, plan, and coordinate its work. These factors were all under plaintiff’s control and were repeatedly brought to plaintiff’s attention, both orally and in writing.
19. On March 11, 1940, the construction engineer called plaintiff’s attention to the fact that the construction program requested on February 20, 1940, had not been received and again requested that it be furnished as promptly, as possible. In directing plaintiff’s attention to the slow progress of its work, the construction engineer stated:
Your attention is directed to paragraphs Nos. 21 and 22 of Specifications No. 877 wherein the working period and liquidated damages for the various features of the work are definitely provided.
So much time has now elapsed since the starting date of your contract that an accelerated rate of progress will be necessary to complete the work within the time allotted.
You are therefore urged to schedule and prosecute the work in such a manner as to insure completion of the various parts within the periods specified.
20. In response to the construction engineer’s repeated requests, plaintiff forwarded its tentative construction schedule on March 21, 1940. This schedule, wMch was prepared by the plaintiff on March 21, 1940, after some of the delays of *504 which it complains had occurred and their effect upon the contract work had been ascertained, listed anticipated completion dates for each schedule or division of the work required under the contract. The following table shows plaintiff’s proposed completion date for each division of the work, as of March 21,1940, for comparison with the contract completion date for each division of the work as required under paragraph 21 of the specifications:

21. Liquidated damages for failure to complete various schedules of the work by the dates fixed in the contract and specifications were withheld from progress payments. On May 1, May 31, and July 12,1940, plaintiff acknowledged the receipt of estimates with deductions for liquidated damages due to failure to complete portions of the work within the contract time. In each protest it contended that all delays encountered were due to weather.
In its letter of May 1, 1940, plaintiff protested deductions from the estimate for the month of April 1940, in the following language:
While we have signed this estimate we do not feel that the retention of $2300.00 out of the amount due us for liquidated damages by reason of the delay in completing certain portions of said work within the time limit is, under the circumstances, justified.
*505 Said delay was not due to any tardiness or neglect to prosecute the work on our part, but was due solely to unavoidable conditions wholly beyond our control occasioned by acts of God in creating severe weather conditions which prevailed during the greater part of the time for which we are penalized. [Italics supplied.]
In its letter of May 31,1940, plaintiff protested deductions from the estimate for the month of May 1940, in the following language:
While we have signed this estimate we do not feel that the retention of $3100.00 from the amount due us for liquidated damages for the month of May by reason of the delay in completing certain portions of said work within the time limit is, under the circumstances, justified.
Said delay was not due to any tardiness or neglect to prosecute the work on our part, but was due solely to unavoidable conditions wholly beyond our control occasioned by acts of God in creating severe weather conditions which prevailed during the greater part of the time for which we are penalized. [Italics supplied.]
On July 12,1940, plaintiff protested deductions on the June estimate for liquidated damages, said protest reading in pertinent part:
The total amount now held by reason of the noncom-pletion of certain portions of the work within the time limit, is $10,700.00. and we do not feel that this penalty is justified under circumstances.
The delay was not due to any tardiness or neglect to prosecute the work on our part, but solely to unavoidable conditions wholly beyond our control occasioned by act of God in the creation of severe weather conditions which prevailed during the early months of the year. [Italics supplied.]
22. On October 15,1940, the contracting officer issued findings of fact upon the contractor’s requests of May 1 and July 12, 1940, in which extensions of time and relief from liquidated damages for delay in completion of the various divisions of the work were requested on the grounds that the *506 delays were due to severe weather conditions which prevailed during the early months of the year. After reviewing in detail the weather conditions which prevailed from December 1989 to April 1940, the contracting officer found that unusually severe weather during this period had resulted in an excusable delay of 17 calendar days in the completion of the contract, and that in accordance with the provisions of Article 9 of the contract, the time for performance of each division of the work (as stated in paragraph 21 of the specifications) should be extended for a period of 17 calendar days. A copy of these findings, in which the contractor’s attention to its right of appeal was noted, was forwarded to the contractor on October 22, 1940.
23. Plaintiff requested and was granted extensions of time for perfecting an appeal from the contracting officer’s findings of October 16,1940, and for the presentation of evidence to the head of the Department in substantiation of its appeal.
On August 8, 1942, the head of the Department issued a final administrative determination upon the contractor’s appeal from the contracting officer’s findings of fact relative to the unusually severe weather between December 1939 and April 1940, for which an extension of 17 days on each schedule or division was granted by the contracting officer in his findings of October 15, 1940. After reviewing in detail the plaintiff’s appeal and the evidence upon which the contracting officer had determined that the contract time should be extended for 17 days due to excusable delays during this period, the head of the Department concluded his affirmation of the findings of fact of the contracting officer and dismissal of the contractor’s appeal in the following language:
Although the particular method of calculation by which the contracting officer arrived at 17 days as the extent of delay caused by unusually severe weather may be subject to some difference of opinion, I do not find, after a careful review of the evidence, that there exists any basis for a more liberal extension of time. The con-elusion reached is adequately supported by the record. The extra time allowance appears ample to take care of any delays caused directly by unusually severe *507 weather or from conditions resulting from such, weather. No evidence has been submitted which would warrant any further extension of time due to this cause.
■ The finding of fact of the contracting officer is affirmed and the contractor’s appeal dismissed.
24. On October 20,1941, the defendant received an undated claim from the contractor in which it requested “remission of liquidated damages withheld under the contract due to delays occasioned by weather conditions and conditions resulting immediately therefrom,” as well as consideration of claims for additional compensation allegedly due under the contract. In his findings on this claim, the contracting officer noted that the claim received on October 20,1941, sought remission of liquidated damages deducted over the entire period of the contract in the sum of $40,200, a portion of which had been covered and excused by the October 15,1940 findings of the contracting officer which were then on appeal to the head of the Department. The contracting officer stated in his findings that the plaintiff’s claims for additional compensation would be considered by him in separate findings; that his findings of October 15, 1940, had considered all delays arising from unusually severe weather which prevailed during the period from December 1939, the beginning of work, to April 1940, inclusive; and that his findings of November 7, 1942, would therefore consider weather conditions prevailing only during that portion of the contract period after April 1940.
The portions of the liquidated damages in question in this suit are those which were withheld for plaintiff’s failure to complete abutments 1 and 2 and piers 2 and 3 within the revised and extended completion dates. Plaintiff’s contentions relative to the delays allegedly encountered on these schedules of the work are to be found in its undated October 1941 claim as Claim Item Nos. 2, 7, 9, and 10. In requesting further extensions of time and remission of liquidated damages for failure to complete abutments 1 and 2 within the extended completion date, the plaintiff, in addition to its prior contentions relative to weather, also presented for the first time a contention that its work on this schedule had been delayed by other contractors working in the same area *508 and by the Bureau’s failure to supply aggregates from the Columbia Construction Company. Its contentions relative to these two alleged causes of delay were presented in the following language:
Work on this schedule was under way upon receipt of notice to proceed with the work but could not be diligently prosecuted because the contractor for the construction of the Railroad Tunnel at this location had not completed its contract and was occupying the abutment site. This condition hindered and delayed the progress of our operations.
As these two Abutments were practically completed at the same time with the greater delay on Abutment No. 2, we shall consider it as representative for the schedule.
Another contributing factor of delay was that the Bureau’s Agency, the Columbia Construction Company, was unable to supply concrete aggregates for a period of time far greater than the Bureau’s assessment against us for lost days and liquidated damages.
In passing upon these contentions, the contracting officer considered and dismissed these contentions with the following findings:
21. By claim No. 7, “Exhibit 7,” the contractor claims remission of liquidated damages for an indefinite period on abutments Nos. 1 and 2, and alleges various delays. First, that another Government contractor had not completed its contract and was occupying the abutment site, hindering and delaying progress of the Union Paving Co.’s operations. It is to be noted in this connection that Union Paving Co. commenced work on November 16, 1939, although notice to proceed was not received until December 9, 1939. West Construction Company placed the concrete lining in the cut-and-cover section at the north portal of tunnel No. 2 on November 21 to 25, 1939, and began stripping the inside forms on December 2, 1939, completing all clean-up and removal of materials by December 6. Prior to December 2, Union Paving Co. complained to the inspector on tunnel No. 2 that some equipment or materials of West Construction Company was in his way. The West Construction Company promptly removed the equipment or materials, and none was in the way on December 9, 1939, the date of receipt of notice to proceed by Union Paving Co.
*509 22. The contractor further claims that the Columbia Construction Company, the contractor for processing concrete aggregates, was unable to supply concrete aggregate for a period of time, etc. Specifications No. 877 provides as follows relative to sand and gravel
Paragraph 23. — “Sand and broken rock or gravel will be delivered to the contractor’s trucks at the gravel plant near Bedding, California, as shown on the location map. All other materials furnished by the Government will be delivered to the contractor f. o. b. cars at Bedding, California. The contractor shall haul all of the materials from the points of delivery to the work; * * *”
Paragraph 57. — “The contractor shall give the contracting officer written notice of sand and broken rock or gravel requirements not less than 20 days in advance of the time when such materials will be required for use.”
In letter to the Bureau dated December 28,1939, and attached hereto as “Exhibit 10,” the contractor states:
“We would like delivery on the concrete aggregates by January 18, 1940. This request is made to comply with the Specifications, Page 27, Paragraph 57.”
No other written notices in compliance with the above requirements are of record.
23. The Columbia Construction Company’s gravel plant at Bedding was completed and made the first trial run on December 21, 1939. It operated intermittently thereafter during the 30-day trial period of adjustment without producing any aggregates for use in concrete. On January 15, 1940, it then appearing that suitable concrete aggregates would not be available at the Columbia Construction Company’s gravel plant for some time, the Union Paving Co. was verbally requested to submit a. price for furnishing aggregates from a local commercial plant under a proposed extra work order for its immediate concrete needs. By letter dated January 19, 1940, attached hereto as “Exhibit 11,” the Union Paving Co. submitted the exorbitant price for aggregates of $4.25 per cubic yard of concrete in place. No action was taken on this proposal since the Union Paving Co. was not then ready to begin concrete placing and before they were ready, aggregate was available at the Columbia Construction Company’s plant. At a conference on January. 18,1940, between officials of the Union Paving Co. and inspectors of the Bureau, arranged for the purpose of discussing the slow progress of the work, the manager of Union Paving Co. showed little inclination *510 to expedite the work and stated in effect that he did not intend to do much work till more favorable weather. At this time the superintendent complained verbally to the. chief inspector that concrete aggregates were not available at the Columbia Construction Company’s plant whereupon the chief inspector assured both the manager and the superintendent that the Bureau would furnish aggregates from some source when they were ready to place concrete.
24. The first aggregate for Government use was delivered at the Columbia Construction Company’s plant to CCC trucks on February 5, 1940. The next aggregate for Government use was delivered to the contractor for O’Brien Creek bridge on March 9,1940, who hauled 9,060 tons during the balance of the month. The Union IPaving Co. completed the construction of its aggregate storage bunkers on March 15, 1940, and began hauling aggregates from the Columbia Construction Company’s plant on March 16, 1940, hauling 1,208 tons during the balance of the month. The first concrete was placed in abutment No. 1 on March 22, 1940, and in abutment No. 2 on April 12,1940.
25. By letter to the Union Paving Co. dated February 20, 1940, copy of which is attached hereto as “Exhibit 12,” the construction engineer reminded the contractor of the provisions of paragraph 21 of the specifications relative to furnishing the contracting officer with his construction program and requested that he furnish such a program in the very near future. By letter dated March 11, 1940, copy of which is attached hereto as “Exhibit 13,” the construction engineer again requested that the contractor furnish his construction program. He complained of the slow progress of the work and urged the contractor to accelerate his progress, reminding him of the specification provisions covering contract periods and liquidated damages. By letter dated March 21,1940, copy of which is attached hereto as “Exhibit 14,” the contractor submitted a construction program, the first entry of which showed that the first concrete would be placed in curbs and gutters at abutment No. 1, on March 22,1940.
26. By letter dated February 15,1940, attached hereto as “Exhibit 15,” the contractor requested that the first carload of cement be delivered on February 27, 1940. This car of cement was not unloaded by the contractor until March 4. By letter dated March 2,1940, attached hereto as “Exhibit 16,” the contractor in explaining the *511 cause of demurrage on the above' car of cement states “* * * we were unable to complete our plant in order to unload the car of cement.”
In its October 1941 claim, plaintiff sought to attribute its delay in completing piers 2 and 3 to unseasonable weather and a carpenters’ strike. In addition to claiming delays due to these factors, plaintiff asserted a blanket claim for remission of liquidated damages for the entire period of delay on these schedules by a review of its construction schedule. The contracting officer, in passing upon these contentions, granted extensions of time for unusually severe weather and the carpenters’ strike, and made the following comment relative to plaintiff’s claim for remission of liquidated damages for the unexcused delays:
30. In claims Nos. 9 and 10, “Exhibit 7,” relative to piers Nos. 2 and 3, the contractor makes blanket claim for remission of all liquidated damages, supporting the claims with little other than a review of his construction procedure, for which the Government can assume no responsibility. Attention is invited to findings of fact dated October 15,1940, providing for an extension of 17 calendar days on these piers and to paragraph 16 hereof.
After reviewing in detail the plaintiff’s contentions relative to the delays encountered on each schedule of the work and the facts pertinent to the progress of the work on each schedule, the contracting officer summarized his findings on each schedule of the contract as follows:
(a) Abutments Nos. 1 and 2, by the terms of the contract, were required to be completed on or before April 7,1940. Time for completion of these abutments was extended 25 calendar days by order for changes No. 1, or to a final date of completion of May 2, 1940. By contracting officer’s findings of fact dated October 15,1940, the time for completion was extended 17 calendar days or to May 19,1940. The contractor has filed an appeal from the findings and the matter is now pending in the department. The work on abutments Nos. 1 and 2 was satisfactorily completed on July 11,1940. No excusable delay in the completion of abutments Nos. 1 and 2 is found from any of the causes considered in these findings.
(b) Pier 1, by the terms of the contract, was required to be completed on or before June 6, 1940. Time for *512 completion of the pier was extended 17 calendar days by contracting officer’s findings dated October 15, 1940. The contractor has filed an appeal from the findings and the matter is pending in the department. Pier 1 was satisfactorily completed on June 29, 1940. Fourteen calendar days’ delay is found to have arisen from the Government’s requirements for excavation below the depth of excavation shown on specification drawings and this delay is found to be excusable under the provisions of article 9 of the contract. No other delays from excusable causes are found.
(c) Pier 2, by the terms of the contract, was required to be completed on or before July 16, 1940. Time for completion of the pier was extended 17 calendar days by contracting officer’s findings dated October 15, 1940. The contractor has filed an appeal from the findings and the matter is pending in the department. Pier 2 was satisfactorily completed on October 11,1940. Completion of pier 2 is found to have been delayed three days by the occurrence of unusually severe weather during October 1940. No other delays to the completion of pier 2 from excusable causes are found.
(d) Abutments Nos. 3 and 4, and piers 8, 9, and 10, by the terms of the contract were required to be completed on or before August 5, 1940. Time for completion of this division of the work was extended 17 calendar days by contracting officer’s findings dated October 15, 1940. The contractor has filed an appeal from the findings and the matter is pending in the department. All work under this division was satisfactorily completed on August 23,1940. Completion of this division of the work is found to have been delayed ten days by the Government’s requirements that the excavation of pier 9 be carried below the depth shown on contract drawings. Completion of this division of the work is found to have been delayed two days also by the Government’s requirement that air and water lines be changed during construction. Delays from these requirements by the Government are found to be excusable.
(e) Pier 3, by the terms of the contract, was required to be completed on or before September 14,1940. Time for completion of pier 3 was extended 17 calendar days by contracting officer’s findings dated October 15, 1940. The contractor has filed an appeal from the findings and the matter is pending in the department. Pier 3 was satisfactorily completed on February 27, 1941. Completion of pier 3 is found to have been delayed nine days because of carpenter’s strike and reorganization of the *513 work after the strike, during February and March 1941. Completion of pier 3 is found to have been delayed also by the prevalence of unusually severe weather after October 1940, for 16 days. No other delays from excusable causes are found to have occurred during the construction of pier 3.
(f) Piers 6 and 7, under the terms of the contract, were required to be completed on or before January 12, 1941. Piers 6 and 7 were satisfactorily completed on November 19, 1940, and thus there was no delay in the completion of this division of the work.
(g) Pier 5, under the terms of the contract, was required to be completed on or before March 3, 1941. Pier 5 was satisfactorily completed on December 8,1940, and thus there was no delay in the completion of this division of the work.
(h) Pier 4, under the terms of the contract, was required to be completed on or before April 22, 1941. Time for completion of pier 4 was extended 17 calendar days by contracting officer’s findings of fact dated October 15, 1940. The contractor has filed an appeal from the findings and the matter is now pending in the department. Pier 4 was satisfactorily completed on May 30, 1941. Completion of pier 4 is found to have been delayed ten days by the Government’s requirements for excavation below the elevations shown on the specification drawings. Completion of pier 4 is found also to have been delayed a total of 30 calendar days after October 1940, by the prevalence of unusually severe weather. A further delay of nine days during February and March 1941, is found to have resulted from a carpenter’s strike. All these delays in completion of pier 4 are found to have arisen from causes which are excusable under the provisions of article 9 of the contract.
40. In accordance with article 9 of United States Standard Form of Contract No. 23, the time for performance of the various divisions of the work is extended as follows:
(a) For completing abutments Nos. 1 and 2, no additional time.
(b) For completing pier 1, fourteen (14) calendar days’ additional time.
(c) For completing pier 2, three (3) calendar days’ additional time-
id) For completing abutments Nos. 3 and 4, and piers 8, 9, and 10, twelve (12) calendar days’ additional time.
(e) For completing pier 3, twenty-five (25) calendar days’ additional time.
*514 (f) For completing piers 6 and 7, no additional time.
(g) For completing pier 5, no additional time.
(h) For completing pier 4, forty-nine (49) calendar days’ additional time.
25. Following numerous requests for extensions of time within which to perfect an appeal from the contracting officer’s findings of November 7, 1942, and a motion for a rehearing upon the head of the Department’s administrative decision of August 8,1942 (affirming the contracting officer’s findings of October 15, 1940), the plaintiff’s appeal and motion were taken under consideration by the head of the Department and an administrative decision thereon was entered under date of July 3,1943. In this decision, the head of the Department stated that his decision on the appeal from the November 7, 1942 findings was directed primarily to the portion of the findings to which plaintiff’s objections were specifically directed, namely, claims for additional extensions of time and remission of liquidated damages. After reviewing in detail the contracting officer’s findings relative to the delay on each of the schedules or divisions of the work and the arguments presented by the plaintiff in support of its contentions that additional time should be granted and liquidated damages remitted, the head of the Department affirmed the findings of the contracting officer and dismissed the appeal. The decision, in pertinent part, stated:
* * * The appeal offers no new evidence in support of the claims for additional extensions on account of unusually severe weather greater than originally allowed, and the findings of November 7, 1942, is corroborative of the original finding and extensions as affirmed by M. 31578, supra. Parenthetically, it may be observed that, in the absence of new, convincing evidence which the contractor may desire to present upon a motion for a rehearing, the record discloses no reason to disturb the finding and decisions as rendered.
In summary, it appears that the contractor encountered several difficulties and causes of delay in completing its contract. Some of the delays are excusable under the terms of the contract, others are attributable to the contractor itself. In no instance is there persuasive *515 evidence of any act or failure to act on the part of the Government, its officers or employees, in violation of or contrary to the contract provisions and specifications. The contracting officer appears to have granted adequate extensions of time in all instances where delays were occasioned by causes excusable under the contract.
The findings of the contracting officer therefore are -affirmed and the appeal is dismissed.
26. The plaintiff on August 4,1943, filed a motion for rehearing of the decision by the head of the Department, referred to in the above finding.
27. On October 11, 1945, the Assistant Secretary of the Department of the Interior issued an administrative decision which is in evidence as plaintiff’s exhibit No. 103 and is hereby made a part of this finding.
By this administrative finding, all liquidated damages were ordered remitted as the Assistant Secretary could find no basis for the assessment of liquidated damages. After considering the legal effect of the contract documents, he concluded as a matter of law that the plaintiff was not bound by the completion dates contained in the contract and specifications. The only references in this decision to the facts of delay and the extension of time for completing the work are found in the following portions of the decision:
The additional reasons to those stated above why, in my opinion, the Government could not in equity and good conscience assess the' large amounts for liquidated damages which the contracting officer has felt obliged, under his construction of the contract provisions, to assess, make it unnecessary to review or comment upon the many and varied arguments, dealing principally with delays incident to weather conditions, which have heretofore been submitted and considered.
It appears unnecessary to review the lengthy arguments which have been indulged in by the contractor and the contracting officer in an attempt to substantiate the merit or demerit of the various delays and extensions of time applied for, allowed, and denied, since, pursuant to the conclusions reached in part I of this finding, the contractor is not properly *516 subject to the assessment of liquidated damages for interim construction delays under the contract.
*****
28. The contracting officer’s findings, as affirmed by the head of the Department, as to the extent of the delay and its causes, are supported by substantial evidence.
29. After the decision- of October 11, 1945, was issued by the head of the Department, plaintiff in writing demanded of the defendant the payment at once of the $40,200 withheld as liquidated damages. On May 15, 1946, the contracting officer advised plaintiff that the construction engineer was being instructed to prepare and issue at that time a voucher covering the remission of liquidated damages. On June 3, 1946, the contracting officer advised that such a voucher had been prepared and was then being processed, and on J une 6, 1946, he advised that the voucher had been sent to the Acting Construction Engineer to be forwarded to plaintiff for signature. Plaintiff signed the voucher and returned it to defendant on J une 6,1946, and having heard nothing further about it made further inquiry of defendant on January 15, 1947. On January 27, 1947, the contracting officer advised plaintiff that the voucher for liquidated damages was on July 5,1946, forwarded to the General Accounting Office for final settlement.
30. The General Accounting Office on July 31,1947, determined that the 17 days’ extension of time for unusually severe winter weather should have been allowed and released to plaintiff $15,800 of the $40,200 which defendant had been holding. Defendant continued to hold the remaining $24,400, which sum has never been paid to the plaintiff.
CONCLUSION OP LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.
Judgment is rendered against the plaintiff for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.