PETROLITE CORPORATION, Ltd.,
v.
UNITED STATES.
Nos. 49996, 49997.

United States Court of Claims.
May 7, 1958.

Everett B. Laybourne, Los Angeles, Cal., for plaintiff. Schultheis & Laybourne, Los Angeles, Cal., were on the briefs.

G. M. Paddack, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

WHITAKER, Judge.

Pursuant to the Lend-Lease Act of March 11, 1941 (55 Stat. 31, 22 U.S.C. A. §§ 411–423), the United States and the Union of Soviet Socialist Republics on June 11, 1942, entered into what is called the "Mutual Aid Agreement," otherwise known as the Second Protocol. Under it the United States engaged to continue to supply the U.S.S.R. with defense articles. It covered the period July 1, 1942 to June 30, 1943. It was followed by the Third Protocol, covering the succeeding year.

Case No. 49996 concerns equipment furnished under the Second Protocol, and No. 49997 concerns equipment furnished under the Third Protocol.

Russia desired desalting and dehydrating equipment for use in the refinement of crude petroleum, and instructions for their use. In order to furnish this to Russia, the United States entered into negotiations with plaintiff for their purchase and for licenses to use the patents and secret processes connected with their use, which plaintiff had developed. (On the equipment and on some of the processes connected with their use plaintiff had secured patents. Those on which patents had not been secured, plaintiff kept secret, so far as it could.)

As a result of these negotiations, plaintiff, on January 5, 1943, submitted to defendant three proposals for the supply of its dehydrating and desalting equipment. On January 19, 1943, defendant accepted the proposals, with an amendment, and issued to plaintiff three purchase orders therefor, Nos. E 4025, E 8003, and E 10,003, stating a total consideration of $424,358.00, which has been paid.

Plaintiff's proposals for the sale of this equipment recited:

"This proposal does not include any rights to use the Petreco dehydrating and desalting processes, or any patent rights, licenses or inventions, patented or unpatented, relating thereto or to the equipment herein described, nor does this proposal include any engineering or technical data, information, instructions, or advice relating thereto, it being understood that Procurement Division, Treasury Department will make arrangements and provide compensation satisfactory to Petrolite and Procurement Division, Treasury Department for the use of such processes, etc. with the above described equipment in the U. S. S. R., the engineering to be provided by Petrolite under this proposal being limited to the design and supply of the equipment herein described."

This provision of the proposal was accepted by defendant, but the purchase orders contained an article, IV(o), which had not been contained in the proposal, which required plaintiff to furnish "general operating instructions for the equipment," as a part of the purchase price.

Subsequently, in July 1943, plaintiff and defendant entered into a contract, antedated May 28, 1943, for a license to use, in the Union of Soviet Socialist Republics, the Petreco processes of electrical dehydration and the Petreco process of electrical desalting, in connection with the operation of the equipment purchased. The license was for a period of 18 months, with an option to renew it for a period to end with the cessation of hostilities or of Lend-Lease operations, whichever was later. The consideration for the license was the payment of one-half cent ($\frac{1}{2}\cent$) per barrel per day for the aggregate designed treating capacity of each piece of dehydration equipment sold, and one-half cent ($\frac{1}{2}\cent$) per barrel per day of the aggregate designed treating capacity of each piece of desalting equipment sold. This was the compensation provided for the license for the 18 months' period. For any subsequent operation under an extension of the license exercised by the United States, the defendant agreed to pay the sum of $15,208.33 for each month of operation.

At the expiration of the 18 months' period, the United States notified plaintiff that it would not exercise its option to extend the license beyond the 18 months' period. All payments due for the license for the 18 months' period have been paid. The equipment is still in the possession of the U. S. S. R. Whether or not the U. S. S. R. continued to use the equipment and the patents and other processes covered by the license does not appear, but it may be presumed that it has continued to do so.

It goes without saying that the rights of the parties are determined by the written documents executed, and not by what may have been said in the negotiations culminating in their execution.

Union Paving Co. v. United States, 115 F.Supp. 179, 126 Ct.Cl. 478, 489; Manufacturers Casualty Ins. Co. v. United States, 63 F.Supp. 759, 105 Ct.Cl. 342.

The license set out the amounts to be paid by the defendant for the use of the Petreco processes during the 18 months' period, and for any extension thereof. These amounts have been paid. The license calls for the payment by the United States of nothing further. On the other hand, it expressly exonerates the United States from additional liability.

The fourth section of the license agreement provided that, subject to the provisions of section fifth,—

"* * * the Government shall be relieved from the obligation to make all payments specified in Sections Second and Third hereof except those then due, and the license granted herein shall be terminated if

"(1) * * *

"(b) The operation thereof under Lend-Lease has been terminated; * * *"

(Section second provided for the payments to be made during the 18-month period, and section third, for the payments during any extension thereof.)

When the defendant notified plaintiff it would not exercise its option to extend the period of the license, the operation under Lend-Lease was terminated, and the United States was exonerated from making further payments for its use. However, if the U. S. S. R. continued to use the processes, it was liable to plaintiff to compensate it therefor, as provided in section fifth. This section provides:

"Fifth: Nothing shall waive, limit or prejudice in any way the claims or rights which Petrolite shall have for other and additional compensation with respect to or as a result of the delivery or other disposition by or for the Government of said equipment or units or the communication or other disposition by or for the Government of any in-

formation relating to the Petreco process of electrical dehydration or the Petreco process of electrical desalting, or to said equipment or units, or to the use or operation thereof, or with respect to or *as a result of the use or operation after the termination of the license herein granted* of said processes or either of them, or of any such information, or of any of said equipment or units, or with respect to or as a result of the use of said processes or either of them, or of any such information otherwise than in connection with the operation of said equipment and units, or with respect to or as a result of the use of said processes or of either of them or of any of such information, or the use or operation of any of said equipment or units *otherwise than in accordance with the license herein granted,* and Petrolite reserves all rights it may now or hereafter have for such other and additional compensation at law or in equity and/or under Section 7 of the Lend-Lease Act and Article IV of the Mutual Aid Agreement between the Governments of the United States and of the U. S. S. R. dated June 11, 1942, and other terms and provisions of such Act and Agreement, and/or under any other law, act, agreement or treaty to which the Government is or may be subject or a party; * * * " [Italics ours.]

Article IV of the Mutual Aid Agreement provides:

"If, as a result of the transfer to the Government of the Union of Soviet Socialist Republics of any defense article or defense information, it becomes necessary for that Government to take any action or make any payment in order fully to protect any of the rights of a citizen of the United States of America who has patent rights in and to any such defense article or information, the Government of the Union of Soviet Socialist Republics will take such action or make such payment when requested to do so by the President of the United States of America."

Under this article, the U. S. S. R. is liable for a continued use of the patents and processes covered by the license beyond the 18 months' period, upon notification from the United States, as required by the above article.

On March 3, 1947 the Lend-Lease Administrator advised plaintiff that the Office of Foreign Liquidation Commissioner, Department of State, on February 10, 1947, confirmed by subsequent letter of February 13, 1947, had advised the Soviet Government that if it made use of the processes covered by the license after the expiration of the 18 months' period, it would become liable to pay to plaintiff "whatever royalties may become due by reason of such use." The letter also made "a formal request to the Soviet Government to make directly to you [the plaintiff] such payments as it may become liable to make under the circumstances outlined above." The letter further advised plaintiff that the Soviet Government had informed the Department of State that an oil mission would shortly visit the United States to make a license agreement for oil refining processes on behalf of the Soviet Government.

Thereafter, defendant repeatedly requested the U. S. S. R. to compensate plaintiff, without success.

There can be no question that the U. S. S. R. is liable for further use of the patents and processes, but nowhere do we find an agreement on the part of the United States that it will pay plaintiff additional compensation if Russia refuses to do so. The United States was given the option to extend the license, but it refused to do so, thereby negativing any obligation on it to pay for further use of the equipment. In addition, Article IV of the license expressly relieved it from the obligation to make the payment specified in sections second and third upon termination of operations under Lend-Lease. These operations were ter-

minated when defendant refused to extend the period of the license.

For the period covered by the license the payments to be made by the United States are set forth in sections second and third, and, of course, it cannot·be reasonably insisted that the United States agreed to pay some indefinite sum in addition thereto; in fact, such an·intention is expressly negatived by the proviso to the fifth section, reading:

"* * * provided, however, that nothing contained in this Section Fifth shall entitle Petrolite to payments for the use of the processes or either of them in said units hereinabove mentioned, to the extent herein licensed, computed at a rate in excess of the rates used to compute the payments specifically provided for herein."

Section fifth is verbose and complex, but, broken down, it amounts to this: It undertakes to reserve the "claims or rights" of plaintiff to "additional compensation" "as a result of the use or operation *after the termination of the license herein granted,*" [Italics ours] or for any use "otherwise than in accordance with the license herein granted." And plaintiff expressly "reserves all rights it may now or hereafter have for such other and additional compensation at law or in equity * * *."

■ If we stop there, what right has plaintiff against the United States for use after the termination of the license? The answer must be, none, because the United States declined to exercise its option to renew the license, and terminated operations under Lend-Lease. In no part of the license agreement is there any provision for payments except those set out in sections second and third.

It appears to have been the purpose of section fifth to reserve to plaintiff the right to demand additional compensation from the U. S. S. R. for use after termination of the license period, because the reservation goes on, after the language quoted above, "and/or under section 7 of the Lend-Lease Act and Article

IV of the Mutual Aid Agreement * * *."

Under Lend-Lease and the Mutual Aid Agreement, Russia agreed to make further payments "when requested to do so by the President of the United States of America"; but there is no provision for payment by the United States, if Russia fails to do so.

Plaintiff was evidently fearful that the U. S. S. R. would continue to use its processes, after the termination of the license, as well it might have been, and it wanted to reserve its claim for additional compensation therefor; but nowhere is there an agreement on the part of the United States to pay for such use. All the United States was obligated to do was to use its good offices to induce Russia to do so, and this it has done.

We are of opinion that the United States is liable under the license only for the payments accruing during the 18-month period, or under any extension thereof requested by the United States, and that for any use thereafter, as well as for any additional compensation for use during the 18-month period, the U. S. S. R., and the U. S. S. R. only, is liable.

The second section of the license agreement reads in part:

"As part payment and consideration for said eighteen (18) months' license and for the information disclosed by Petrolite the Government shall and hereby agrees to pay to Petrolite the sum of * * *"

the amounts thereafter set forth. The use of the expression "as part payment" somewhat confuses the matter, but the license contains no provision for any other payment by the United States, and the fourth and fifth sections thereof expressly negative the idea that the United States is liable for any payments in addition to those provided for in sections second and third. However, Petrolite does reserve the right to collect additional compensation from the U. S. S. R., if it is entitled to do so under the Lend-Lease Act and the Mutual Aid Agreement, or otherwise

The following excerpts from the testimony of Mr. Harry E. Larsen, Assistant Chief Counsel for Treasury Procurement, and of Mr. A. J. Walsh, the contracting officer, confirms this construction of the agreement. Mr. Larsen testifies:

"43. Q. Was there ever any intent or expectation on your part, or, as far as you know, on the part of any of the other Government people involved, that more compensation was to be paid under this license contract at some possible future date? A. Not—

"44. Q. Except outside of that option which we have referred to? A. Nothing except as provided by the option (Hill, vol. VI, p. 1177).

"In so far as I knew at that time, we made it most definitely clear that the payment that is provided for in that contract was all that we agreed to bind the United States Government to pay.

"Mr. Schultheis (Petrolite's representative) repeatedly raised the proposition that this was a unique situation; that it would be possible for the Russians, once they were in possession of one such plant, to duplicate it many times.

"And also, in addition to that matter of duplication, he strongly made the point that it would be possible for the Russians to use this plant, or the duplicates of it, over a much longer period of time than was covered by this contract.

"And it was definitely stated by us that we had no authority whatsoever to give any consideration to this question of duplication or use beyond the term which the contract was intended to cover, and we made it definitely clear in our conferences and meetings that we could not, and would not agree to be liable for any further payments on the part of the United States Government for such extra use.

Mr. Walsh testified:

"86 X Q. I believe you testified your understanding of this contract was that any further payments thereunder would be adjusted under Section 7 of the Lend Lease Act—is that correct? A. That is correct.

"87 X Q. Did you mean to say that that is the only way under which any further payments were to be made under this contract, other than the extension which we have— A. That is my understanding, sir. Yes, sir.

"Mr. Laybourne. I see.

"88 X Q. Do you see anything in the contract that says that? A. Well, as I read the thing, I thought that was what it said, sir. On Page 19, sir, it says that—

"89 X Q. What language is it on Page 19? A. The language which starts:

"Whereas the payments to be made by the Government as herein provided are not accepted or recognized by Petrolite as full or adequate compensation, but are made without limitation of or prejudice to the rights of Petrolite with respect to other and additional compensation, the matter of which is being left for future determination in accordance with rights of Petrolite at law or in equity and/or in accordance with applicable laws and provisions made thereunder, including without limitation, Section 7 of the Lend-Lease Act and Article IV of the Mutual Aid Agreement between the Governments of the United States and of the U. S. S. R., dated June 11, 1942, which provides that:

"And it goes on.

"Mr. Laybourne. All right.

"90 X Q. Do you interpret that to mean that the only relief that Petrolite might look forward to would be under Section 7? A. I

think, sir, that was our plan at that time—yes, sir.

"91 X Q. You say that, in spite of the fact that you read the words 'including without limitation'? A. Well, my impression was that the position we took at that time in our negotiation was always that your recourse lay under Section 7 of the Lend Lease Act."

It is true that Mr. Schultheis takes a contrary view, but it is inconceivable to us that the license should provide for the payments to be made during the period of the license, and for any extension thereof, and that the licensee should be liable for further payments in addition to those expressly provided for. Nowhere does the Government agree to pay for the use of the processes after the termination of the license and any extension of it.

We cannot believe the agents of the Government intended to make it liable for a use by another for a time without limit.

It is unfortunate, of course, that the plaintiff has to look alone to the U. S. S. R. for further compensation, but in this respect it fares no worse than other people who have dealt with that Government, including the defendant itself.

2. In case No. 49997 plaintiff sues for an amount it claims to be due under the Third Protocol between the United States and the U. S. S. R. However, no license agreement was ever executed between the plaintiff and the defendant with reference to the equipment to be furnished under the Third Protocol.

On November 17, 1944 plaintiff submitted a proposal for the supply of Petreco dehydration and Petreco desalting equipment, which was followed by purchase orders requiring plaintiff to furnish general operating instructions for the use of the equipment. The equipment purchased was delivered to defendant by plaintiff, but the evidence does not show that the defendant ever furnished this equipment to the U. S. S. R., or that it was ever used by anyone. The equipment itself has been paid for.

We are of opinion that the United States has paid plaintiff all that it obligated itself to pay for the equipment purchased under both protocols and all that it obligated itself to pay for the use of the equipment purchased under the Second Protocol, and that it is not obligated to make any payment for the use of the equipment purchased under the Third Protocol, because no agreement was entered into between plaintiff and defendant for compensation for any use, nor has any use been shown.

Plaintiff's petitions will, therefore, be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.