Whitaker, Judge,
delivered the opinion of the court:
Pursuant to the Lend-Lease Act of March 11, 1941 (55 Stat. 31; 22 U. S. C. 411-423), the United States and the Union of Soviet Socialist Republics on June 11,1942, entered into what is called the “Mutual Aid Agreement,” other *109 wise known as the Second Protocol. Under it the United States engaged to continue to supply the U. S. S. R. with defense articles. It covered the period July 1, 1942 to June 30,1948. It was followed by the Third Protocol, covering the succeeding year.
Case No. 49996 concerns equipment furnished under the Second Protocol, and No. 49997 concerns equipment furnished under the Third Protocol.
Russia desired desalting and dehydrating equipment for use in the refinement of crude petroleum, and instructions for their use. In order to furnish this to Russia, the United States entered into negotiations with plaintiff for their purchase and for licenses to use the patents and secret processes connected with their use, which plaintiff had developed. (On the equipment and on some of the processes connected with their use plaintiff had secured patents. Those on which patents had not been secured, plaintiff kept secret, so far as it could.)
As a result of these negotiations, plaintiff, on January 5, 1948, submitted to defendant three proposals for the supply of its dehydrating and desalting equipment. On January 19, 1943, defendant accepted the proposals, with an amendment, and issued to plaintiff three purchase orders therefor, Nos. E 4025, E 8003, and E 10,003, stating a total consideration of $424,358.00, which has been paid.
Plaintiff’s proposals for the sale of this equipment recited:
This proposal does not include any rights to use the Petreco dehydrating and desalting processes, or any patent rights, licenses or inventions, patented or un-patented, relating thereto or to the equipment herein described, nor does this proposal include any engineering or technical data, information, instructions, or advice relating thereto, it being understood that Procurement Division, Treasury Department will make arrangements and provide compensation satisfactory to Petrolite and Procurement Division, Treasury Department for the use of such processes, etc. with the above described equipment in the U. S. S. R., the engineering to be provided by Petrolite under this proposal being limited to the design and supply of the equipment herein described.
This provision of the proposal was accepted by defendant, but the purchase orders contained an article, IV (o), which had *110 not been contained in the proposal, which required plaintiff to furnish “general operating instructions for the equipment,” as a part of the purchase price.
Subsequently, in July 1943, plaintiff and defendant entered into a contract, antedated May 28, 1943, for a license to use, in the Union of Soviet Socialist Republics, the Petreco processes of electrical dehydration and the Petreco process of electrical desalting, in connection with the operation of the equipment purchased. The license was for a period of 18 months, with an option to renew it for a period to end with the cessation of hostilities or of Lend-Lease operations, whichever was later. The consideration for the license was the payment of one-half cent (%$) per barrel per day for the aggregate designed treating capacity of each piece of dehydration equipment sold, and one-half cent (%0) per barrel per day of the aggregate designed treating capacity of each piece of desalting equipment sold. This was the compensation provided for the license for the 18 months’ period. For any subsequent operation under an extension of the license exercised by the United States, the defendant agreed to pay the sum of $15,208.33 for each month of operation.
At the expiration of the 18 months’ period, the United States notified plaintiff that it would not exercise its option to extend the license beyond the 18 months’ period. All payments due for the license for the 18 months’ period have been paid. The equipment is still in the possession of the U. S. S. R. Whether or not the U. S. S. R. continued to use the equipment and the patents and other processes covered by the license does not appear, but it may be presumed that it has continued to do so.
It goes without saying that the rights of the parties are determined by the written documents executed, and not by what may have been said in the negotiations culminating in their execution. Union Paving Co. v. United States, 126 C. Cls. 478, 489; Manufacturers Casualty Ins. Co. v. United States, 105 C. Cls. 342.
The license set out the amounts to be paid by the defendant for the use of the Petreco processes during the 18 months’ period, and for any extension thereof. These amounts have *111 been paid. The license calls for the payment by the United States of nothing further. On the other hand, it expressly exonerates the United States from additional liability.
The fourth section of the license agreement provided that, sub j ect to the provisions of section fifth,—
* * * the Government shall be relieved from the obligation to make all payments specified in Sections Second and Third hereof except those then due, and the license granted herein shall be terminated if * * *
(b) The operation thereof under Lend-Lease has been terminated; * * *
(Section second provided for the payments to be made during the 18-month period, and section third, for the payments during any extension thereof.)
When the defendant notified plaintiff it would not exercise its option to extend the period of the license, the operation under Lend-Lease was terminated, and the United States was exonerated from making further payments for its use. However, if the U. S. S. R. continued to use the processes, it was liable to plaintiff to compensate it therefor, as provided in section fifth. This section provides:
Fifth: Nothing shall waive, limit or prejudice in any way the claims or rights which Petrolite shall have f or other and additional compensation with respect to or as a result of the delivery or other disposition by or for the Government of said equipment or units or the communication or other disposition by or for the Government of any information relating to the Petreco process of electrical dehydration or the Petreco process of electrical desalting, or to said equipment or units, or to the use or operation thereof, or with respect to or as a result of the use or operation after the termination of the license herein granted, of said processes or either of them, or of any such information, or. of any of said equipment or units, or with respect to or as a result of the use of said processes or either of them, or of any such information otherwise than in connection with the operation of said equipment and units, or with respect to or as a result of the use of said processes or of either of them or of any of such information, or the use or operation of any of said equipment or units otherwise them in accordance with the license herein granted, and Petrolite reserves all rights it may now or hereafter have for such other *112 and additional compensation at law or in equity and/or under Section 7 of tbe Lend-Lease Act and Article IV of the Mutual Aid Agreement between the Governments of the United States and of the U. S. S. R. dated June 11, 1942, and other terms and provisions of such Act and Agreement, and/or under any other law, act, agreement or treaty to which the Government is or may be subject or a party; * * * [Italics ours.]
Article IV of the Mutual Aid Agreement provides:
If, as a result of the transfer to the Government of the Union of Soviet Socialist Republics of any defense article or defense information, it becomes necessary for that Government to take any action or make any payment in order fully to protect any of the rights of a citizen of the United States of America who has patent rights in and to any such defense article or information, the Government of the Union of Soviet Socialist Republics will take such action or make such payment when requested to do so by the President of the United States of America.
Under this article, the U. S. S. R. is liable for a continued use of the patents and processes covered by the license beyond the 18 months’ period, upon notification from the United States, as required by the above article.
On March 3,1947 the Lend-Lease Administrator advised plaintiff that the Office of Foreign Liquidation Commissioner, Department of State, on February 10,1947, confirmed by subsequent letter of February 13, 1947, had advised the Soviet Government that if it made use of the processes covered by the license after the expiration of the 18 months’ period, it would become liable to pay to plaintiff “whatever royalties may become due by reason of such use.” The letter also made “a formal request to the Soviet Government to make directly to you [the plaintiff] such payments as it may become liable to make under the circumstances outlined above.” The letter further advised plaintiff that the Soviet Government had informed the Department of State that an oil mission would shortly visit the United States to make a license agreement for oil refining processes on behalf of the Soviet Government.
Thereafter, defendant repeatedly requested the U. S. S. R. to compensate plaintiff, without success.
*113 There can be no question that the U. S. S. R. is liable for further use of the patents and processes, but nowhere do we find an agreement on the part of the United States that it will pay plaintiff additional compensation if Russia refuses to do so. The United States was given the option to extend the license, but it refused to do so, thereby negativing any obligation on it to pay for further use of the equipment. In addition, Article IV of the license expressly relieved it from the obligation to make the payment specified in sections second and third upon termination of operations under Lend-Lease. These operations were terminated when defendant refused to extend the period of the license.
For the period covered by the license the payments to be made by the United States are set forth in sections second and third, and, of course, it cannot be reasonably insisted that the United States agreed to pay some indefinite sum in addition thereto; in fact, such an intention is expressly negatived by the proviso to the fifth section, reading:
* * * provided, however, that nothing contained in this Section Fifth shall entitle Petrolite to payments for the use of the processes or either of them in said units hereinabove mentioned, to the extent herein licensed, computed at a rate in excess of the rates used to compute the payments specifically provided for herein.
Section fifth is verbose and complex, but, .broken down, it amounts to this: It undertakes to reserve the “claims or rights” of plaintiff to “additional compensation” “as a result of the use or operation after the termination of the license herein granted,” [Italics ours] or for any use “otherwise than in accordance with the license herein granted.” And plaintiff expressly “reserves all rights it may now or hereafter have for such other and additional compensation at law or in equity * * *.”
If we stop there, what right has plaintiff against the United States for use after the termination of the license? The answer must be, none, because the United States declined to exercise its option to renew the license, and terminated operations under Lend-Lease. In no part of the license agreement is there any provision for payments except those set out in sections second and third.
*114 It appears to have been the purpose of section fifth to reserve to plaintiff the right to demand additional compensation from the U. S. S. R. for use after termination of the license period, because the reservation goes on, after the language quoted above, “and/or under section T of the Lend-Lease Act and Article IY of the Mutual Aid Agreement * *
Under Lend-Lease and the Mutual Aid Agreement, Russia agreed to make further payments “when requested to do so by the President of the United States of America”; but there is no provision for payment by the United States, if Russia fails to do so.
Plaintiff was evidently fearful that the U. S. S. R. would continue to use its processes, after the termination of the license, as well it might have been, and it wanted to reserve its claim for additional compensation therefor; but nowhere is there an agreement on the part of the United States to pay for such use. All the United States was obligated to do was to use its good offices to induce Russia to do so, and this it has done.
We are of opinion that the United States is liable under the license only for the payments accruing during the 18-month period, or under any extension thereof requested by the United States, and that for any use thereafter, as well as for any additional compensation for use during the 18-month period, the U. S. S. R., and the U. S. S. R. only, is liable.
The second section of the license agreement reads in part:
As part payment and consideration for said eighteen (18) months’ license and for the information disclosed by Petrolite the Government shall and hereby agrees to pay to Petrolite the sum of * * *
the amounts thereafter set forth. The use of the expression “as part payment” somewhat confuses the matter, but the license contains no provision for any other payment by the United States, and the fourth and fifth sections thereof expressly negative the idea that the United States is liable for any payments in addition to those provided for in sections second and third. However, Petrolite does reserve the right to collect additional compensation from the U. S. S. R., *115 if it is entitled to do so under the Lend-Lease Act and the Mutual Aid Agreement, or otherwise.
The following excerpts from the testimony of Mr. Plarry E. Larsen, Assistant Chief Counsel for Treasury Procurement, and of Mr. A. J. Walsh, the contracting officer, confirms this construction of the • agreement. Mr. Larsen testifies:
43. Q. Was there ever any intent or expectation on your part, or, as far as you know, on the part of any of the other Government people involved, that more compensation was to be paid under this license contract at some possible future date?
A. Not-
44. Q. Except outside of that option which we have referred to ?
A. Nothing except as provided by the option (Hill, voLYI, p.1177).
In so far as I knew at that time, we made it most definitely clear that the payment that is provided for in that contract was all that we agreed to bind the United States Government to pay.
Mr. Schultheis (Petrolite’s representative) repeatedly raised the proposition that this was a unique situation; that it would be possible for the Russians, once they were in possession of one such plant, to duplicate it many times.
And also, in addition to that matter of duplication, he strongly made the point that it would be possible for the Russians to use this plant, or the duplicates of it, over a much longer period of time than was covered by this contract.
And it was definitely stated by us that we had no authority whatsoever to give any consideration to this question of duplication or use beyond the term which the contract was intended to cover, and we made it definitely clear in our conferences and meetings that we could not, and would not agree to be liable for any further payments on the part of the United States Government for such extra use.
Mr. Walsh testified:
86 X Q. I believe you testified your understanding of this contract was that any further payments thereunder would be adjusted under Section 7 of the Lend Lease Act — is that correct?
A. That is correct.
*116 87 X Q. Did you mean to say that that is the only way under which any further payments were to be made under this contract, other than the extension which we have-
A. That is my understanding, sir. Yes, sir.
Mr. Latbotjrne. I see.
88 XQ. Do you see anything in the contract that says that?
A. Well, as I read the thing, I thought that was what it said, sir. On Page 19, sir, it says that-
89 X Q. What language is it on Page 19 ?
A. The language which starts:
Whereas the payments to be made by the Government as herein provided are not accepted or recognized by Petrolite as full or adequate compensation, but are made without limitation of or prejudice to the rights of Petro-lite with respect to other and additional compensation, the matter of which is being left for future determination in accordance with rights of Petrolite at law or in equity and/or in accordance with applicable laws and provisions made thereunder, including without limitation, Section 7 of the Lend-Lease Act and Article IV of the Mutual Aid Agreement between the Governments of the United States and of the U. S. S. B.., dated June 11, 1942, which provides that:
And it goes on.
Mr. LaxbotjrNE. All right.
90 XQ. Do you interpret that to mean that the only relief that Petrolite might look forward to would be under Section 7 ?
A. I think, sir, that was our plan at that time — yes, sir.
91 X Q. You say that, in spite of the fact that you read the words “including without limitation” ?
A. Well, my impression was that the position we took at that time in our negotiation was always that your recourse lay under Section 7 of the Lend Lease Act.
It is true that Mr. Schultheis takes a contrary view, but it is inconceivable to us that the license should provide for the payments to be made during the period of the license, and for any extension thereof, and that the licensee should be liable for further payments in addition to those expressly provided for. Nowhere does the Government agree to pay for the use of. the processes after the termination of the license and any extension of it.
*117 We cannot believe tlie agents of the Government intended to make it liable for a use by another for a time without limit.
It is unfortunate, of course, that the plaintiff has to look alone to the U. S. S. B. for further compensation, but in this respect it fares no worse than other people who have dealt with that Government, including the defendant itself.
2. In case No. 49997 plaintiff sues for an amount it claims to be due under the Third Protocol between the United States and the U. S. S. B. However, no license agreement was ever executed between the plaintiff and the defendant with reference to the equipment to be furnished under the Third Protocol.
On November 17, 1944 plaintiff submitted a proposal for the supply of Petreco dehydration and Petreco desalting equipment, which was followed by purchase orders requiring plaintiff to furnish general operating instructions for the use of the equipment. The equipment purchased was delivered to defendant by plaintiff, but the evidence does not show that the defendant ever furnished this equipment to the U. S. S. R., or that it was ever used by anyone. The equipment itself has been paid for.
We are of opinion that the United States has paid plaintiff all that it obligated itself to pay for the equipment purchased under both protocols and all that it obligated itself to pay for the use of the equipment purchased under the Second Protocol, and that it is not obligated to make any payment for the use of the equipment purchased under the Third Protocol, because no agreement was entered into between plaintiff and defendant for compensation for any use, nor has any use been shown.
Plaintiff’s petitions will, therefore, be dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Boald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
*118 1. Plaintiff is, and at all times hereinafter mentioned was, a domestic corporation organized and existing under and by virtue of the laws of the State of Delaware with its principal office in the State of Delaware at 100 West Tenth Street in the city of Wilmington.
2. By formal stipulation of the parties, approved by the commissioner, the trial of these cases was limited to the issues of law and fact relating to the right of the plaintiff to recover.
3. At all times hereinafter mentioned plaintiff was, and has been for many years past, and still is, engaged in the business of developing, acquiring, owning, using, licensing, and authorizing the use by others of processes, technical and process information, inventions, improvements, and patents in the field of petroleum processing and preparation, and more particularly in connection with the processes of dehydration and desalting of petroleum.
4. Prior to the transactions hereinafter described, as a result of' extensive and specialized research, development and experience in the field of electrical dehydration and electrical desalting of petroleum, plaintiff had developed the Petreco process of electrical dehydration, the Petreco process of electrical desalting and certain specialized Petreco equipment employed in the operation of the processes. These processes and equipment require for their successful use, design, construction, installation and operation certain specialized process and operating techniques and methods, engineering, design and technical data, information, instructions, know-how and peculiar knowledge, possessed and owned exclusively by plaintiff, as well as plaintiff’s inventions, discoveries and improvements, patented and unpatented, relating thereto.
5. As hereinafter used, the terms “Petreco process of electrical dehydration,” “Petreco process of electrical desalting,” and “Petreco processes” include the aggregate of the processes, the inventions, discoveries and improvements, and the patents and applications for patents utilized in the design, construction and operation of the respective Petreco process, or processes, and equipment, and the term “Petreco technical and process information” includes the specialized process and operating techniques and methods, engineering, design and technical data, information, instructions, know-how and pe *119 culiar knowledge, possessed and owned exclusively by plaintiff, all of which is necessary and essential for the successful use, design, construction, installation and commercial operation of the aforesaid Petreco processes and Petreco equipment.
6. The Petreco technical and process information is, and at the time of the transactions hereinafter described was secret or confidential in nature, and constitutes, and did constitute an asset of great value to plaintiff. In the usual conduct of its business, plaintiff does not, and, except in the transactions between plaintiff and defendant described herein, has not disclosed the Petreco technical and process information to its process licensees or to others outside of its employ. This information has always been and is furnished and made available to plaintiff’s licensee customers in their use of the Petreco processes and Petreco equipment, without disclosures to them, through the agency of plaintiff’s trained engineers and technical personnel, stationed throughout the area of its operations and providing direct personal attention to and responsibility for plant installation, plant operating problems, and continuing efficient performance of the Petreco processes and Petreco equipment. Those of plaintiff’s employees who acquire the Petreco technical and process information do so in a fiduciary capacity, and they are, and for many years have been, contractually bound and obligated not to disclose any part of this information to persons outside of plaintiff’s employ or otherwise except as their respective duties necessarily require.
7. The Petreco processes are, and at the time of the transactions herein mentioned were, and for a number of years prior thereto had been, well known to and in widespread use in the petroleum industry in the United States, Canada, and Venezuela. The Petreco process of electrical dehydration and the Petreco process of electrical desalting are and were terms used in common speech throughout the industry. Prior to World War II the Petreco processes had gained recognition as providing one of the most efficient means for effecting the removal or reduction of salt and water. The processes and the Petreco technical and process information had attained great value, and compensation for the use of *120 the processes and information was computed and paid to plaintiff on the basis of the volume of petroleum treated and processed. This compensation constituted approximately 95 percent of the income of the Petreco Division of plaintiff corporation at and for a number of years prior to the time of the transactions with the defendant.
8. During World War II defendant determined, in prosecution of the American war effort and for purposes deemed important in the interest and vital to the defense of the United States, to procure for its own account and then to furnish to the Government of the Union of Soviet Socialist Republics, under and pursuant to the Act of March 11,1941, 55 Stat. 31, 22 U. S. C. 411-423, sometimes known as the Lend-Lease Act, certain petroleum refining equipment, facilities and processes, including catalytic cracking processes, together with rights to use and operate the same, and all of the know-how and technical data and information necessary to erect, maintain and operate said equipment, facilities and processes, the same to be utilized in the treatment of certain Russian crude oils and in the production of aviation gasoline, lubricating oil and other petroleum products in the U. S. S. R. In furtherance of that general project, and in accomplishing the foregoing objectives, defendant looked to the American petroleum industry to provide and sell to it the aforesaid equipment, facilities, processes, licenses, know-how and technical data and information. The Procurement Division of the United States Treasury Department, hereinafter called Treasury Procurement, was duly authorized to contract for, procure and purchase the plants, processes and information for and on behalf of defendant.
9. Completion of the project was considered and declared by defendant to be of the highest importance and urgency, the President of the United States having himself directed that the matter proceed with all possible dispatch. Procurement of requisite material was effected under Special Direction Urgency No. 5, one of the highest preference ratings assigned to any wartime project.
10. On or about September 22, 1942, the duly authorized and appointed officers and agents of Treasury Procurement were advised by Mr. Oscar Cox, General Counsel for Lend *121 Lease Administration, that payments could properly be made to American companies for information useful in establishing oil refineries in the Soviet Union, the price to be paid therefor to be determined by bargaining and to represent the fair and reasonable value of the information revealed.
11. In the execution of this refinery program, and on or about October 14,1942 and thereafter, plaintiff was advised by the duly authorized and appointed officers and agents of Treasury Procurement that defendant desired to procure from plaintiff, and urgently required, (a) the Petreco dehydration and desalting equipment necessary for the employment of the Petreco process of electrical dehydration and the Petreco process of electrical desalting in certain specified petroleum refineries, (b) the right to use these processes, and (c) the Petreco technical and process information necessary for the design, construction, installation, use and operation of the Petreco processes and Petreco equipment. These processes and technical and process information are and at all times herein mentioned were unique in character and not available to defendant or to the U. S. S. It. or procurable by either of them from any source other than plaintiff.
Prior to the commencement of negotiations between the plaintiff and Treasury Procurement, the plaintiff, through Foster Wheeler Corporation, had communicated with representatives of the U. S. S. E. concerning the nature of and the availability of the Petreco processes and equipment for purchase and use in the U. S. S. E., and had submitted a proposal in connection therewith, but plaintiff did not disclose its Petreco technical and process information.
12. Plaintiff was further advised by the aforesaid officers and agents of Treasury Procurement that E. B. Badger & Sons Company was acting as the duly designated and appointed agent of Treasury Procurement under and by virtue of a contract known as Contract DA-TPS-IYOOO, that three Petreco dehydration plants and three Petreco desalting plants were to be procured and constructed by or for defendant for installation and operation within the territory of the U. S. S. E. as part of the Eussian refinery program under the Lend-Lease Act, that procurement by defendant of all *122 material and equipment would be effected by and through the E. B. Badger & Sons Company but that compensation for the right to use the Petreco processes and for the Petreco technical and process information would be separately provided by Treasury Procurement.
13. Plaintiff was further informed by the Treasury Procurement officers that the Russian refinery program was required by the defendant for the production in Russia of aviation gasoline and other products, and that installation and operation of the refineries within the U. S. S. R. was a matter of highest urgency, and there was a Presidential directive that all equipment be on shipboard by the middle of 1943.
14. The Treasury Procurement officers advised plaintiff that they could not at that time negotiate an agreement for compensation for use of processes and for process information, although they would proceed to negotiate the purchase price for equipment and engineering. Plaintiff’s representative then advised them of the value to plaintiff of the Petreco processes and the Petreco technical and process information, the secret and confidential nature of this information, the compensation paid to plaintiff in the usual course of its business for the use of the processes and for the benefit of this information, and the importance of such compensation to plaintiff’s corporate economy. Plaintiff further stated that fulfillment of defendant’s proposed program would require disclosure by the United States to the U. S. S. R. of all of the Petreco technical and process information, that such disclosure would constitute an irrevocable disposition of this information to the Russians without possibility of recovery of the same from them, that possession of this information would enable the Soviet petroleum industry to duplicate the equipment utilized in the operation of the Petreco processes and to use these processes without limitation, that the U. S. S. R. would thereby acquire from the defendant both the means, and in practical effect an unlimited license, to use the processes to the full extent of the Soviet oil potential requiring dehydration and desalting, and that accordingly, plaintiff could not comply with defendant’s requirements without an agreement as to what compensation *123 defendant would pay for such disclosure and license and as to when such compensation would be paid.
15. The Treasury Procurement officers thereupon reiterated the war urgency of the project, asserted that it was necessary that defendant immediately have the Petreco processes and Petreco technical and process information, and assured plaintiff that while they could not at that time agree to pay a specific amount by a specific date, reasonable compensation would ultimately be paid to plaintiff for the processes and process information.
Plaintiff was further advised by the Treasury Procurement officers that they were considering the early negotiation of license agreements with all of the various owners of processes to be employed in the Bussian refinery program, the agreements to provide payment for process information for a period of time limited to their estimate of the remaining period of hostilities, and based upon the rated capacity of the specific plants to be furnished.
16. Thereafter, plaintiff, with the understanding it would receive reasonable compensation from the defendant, consented that defendant could use the aforesaid Petreco processes, and furnished the necessary Petreco technical and process information to defendant for use by or for the defendant in the design, construction, installation and operation of the Petreco dehydration and desalting plants, and in the employment of the Petreco processes therein.
17. Plaintiff submitted under date of January 5, 1943, three proposals concerning the supply of Petreco dehydration and Petreco desalting equipment to Treasury Procurement, acting by and through its duly designated and appointed agent, E. B. Badger & Sons Company, each of these proposals relating to a Petreco plant containing equipment necessary for the employment of the Petreco process of electrical dehydration and the Petreco process of electrical desalting in a particular petroleum refinery. Thereafter and on or about January 19,1943, these proposals were fully accepted by defendant in writing, and the three contracts were designated as Purchase Orders Nos. E 4025, E 8003 and E 10003.
Purchase Order E 4025, respecting Kefinery No. 3, Boguru-slan crude, included six Petreco dehydration units and six *124 Petreco desalting units Laving a designed electrical dehydration treating capacity of 10,000 barrels per day, and a designed electrical desalting treating capacity of 10,000 barrels per day, for the lump sum price of $84,872.
Purchase Order No. E 8003, respecting Refinery No. 5, Ishimbaev crude, included twelve Petreco dehydration units and twelve Petreco desalting units having a designed electrical dehydration treating capacity of 20,000 barrels per day, and a designed electrical desalting treating capacity of 20,000 barrels per day, for the lump sum price of $169,743.
Purchase Order No. E 10003, respecting Refinery No. 6, Sizran crude, included twelve Petreco dehydration units and twelve Petreco desalting units having a designed electrical dehydration treating capacity of 20,000 barrels per day, and a designed electrical desalting treating capacity of 20,000 barrels per day, for the lump sum price of $169,743.
Subsequently, and under date of June 24, 1943, purchase orders of the same numbers, acknowledging and confirming the aforesaid acceptance of the proposals, and incorporating these proposals therein, were issued. These contracts related to the supply to defendant of Petreco equipment necessary for the employment of the Petreco processes in the aforesaid petroleum refineries, and Article III, as amended, of each of these proposals read as follows:
This proposal does not include any rights to use the Petreco dehydrating and desalting processes, or any patent rights, licenses or inventions, patented or un-patented, relating thereto or to the equipment herein described, nor does this proposal include any engineering or technical data, information, instructions, or advice relating thereto, it being understood that Procurement Division, Treasury Department will make arrangements and provide compensation satisfactory to Petrolite and Procurement Division, Treasury Department for the use of such processes, etc. with the above described equipment in the U.S.S.R., the engineering to be provided By Petrolite under this proposal being limited to the design and supply of the equipment herein described.
By Article II B of each of its proposals, plaintiff agreed to provide “Engineering for the design, specification and supply of the equipment * * * including drafting” and *125 “Plans, flow sheets, erection drawings and foundation drawings of the equipment.”
18. Each of the foregoing purchase orders stated in effect that the purchase price included in addition to the equipment “the necessary engineering, design, drawings, and inspection of such equipment as herein provided”, and Article II (B) thereof provided for “Engineering for the design, specification and supply of the equipment” and “Plans, flow sheets, erection drawings and foundation drawings of the aforesaid equipment.”
Under Article IV (o) of each purchase order, plaintiff was required to furnish in writing “general operating instructions for the equipment”, and it was provided that the cost of preparing, furnishing and delivering the instructions would be a part of the purchase price of the equipment and services. This IV (o) provision was not contained in any of plaintiff’s proposals.
19. In July 1943, plaintiff and defendant entered into a contract in writing, antedated May 28, 1943, a true and correct copy of which is set forth as Exhibit A in the petition in case No. 49996, and is made a part of this finding as if fully set forth herein.
By this agreement designated DA-TPS-35692, plaintiff granted to defendant a nonexclusive indivisible license for use in the U. S. S. B. of the Petreco process of electrical dehydration and the Petreco process of electrical desalting in the units of equipment referred to in finding 17 hereof, having an aggregate designed electrical dehydration treating capacity of 50,000 barrels per day and an aggregate designed electrical desalting treating capacity of 50,000 barrels per day. It was agreed that the payments were to be computed at the rate of one-half cent per barrel per day on each of the aggregate designed treating capacities.
It was recited in the agreement that plaintiff “has disclosed to or for the Government information respecting”, and that the defendant “requires a license from Petrolite for the use of” the Petreco processes of electrical dehydration and desalting of petroleum.
20. One of the recitals of this agreement provided as follows:
*126 Whereas, tbe payments to be made by the Government as herein provided are not accepted or recognized by petrolite as full or adequate compensation, but are made and accepted without waiver or limitation of or prejudice to the rights of petrolite with respect to other and additional compensation, the matter of which is being left for future determination in accordance with the rights of petrolite at law or in equity and/or in accordance with applicable laws and provisions made thereunder, including without limitation, Section 7 of the Lend-Lease Act and Article IY of the Mutual Aid Agreement between the Governments of the United States and of the U. S. S. R., dated June 11, 1942, which provides that:
“If, as a result of the transfer to the Government of the Union of Soviet Socialist Republics of any defense article or defense information, it becomes necessary for that Government to take any action or make any payment in order fully to protect any of the rights of a citizen of the United States of America who has patent rights in and to any such defense article or information, the Government of the Union of Soviet Socialist Republics will take such action or make such payment when requested to do so by the President of the United States of America.”
Provided however that nothing contained in this recital shall entitle petrolite to payments for the use of the processes or either of them in said units hereinabove mentioned, to the extent herein licensed, computed at a rate in excess of the rates used, to compute the payments specifically provided for herein.
.21. Other pertinent provisions of this agreement were as follows:
Second : As part payment and consideration for said eighteen (18) months license and for the information disclosed by petrolite the Government shall and hereby agrees to pay to petrolite the sum of Two Hundred Seventy-three Thousand Seven Hundred Fifty Dollars ($273,750.00), said sum being equivalent to one-half cent (%0) per barrel of the aggregate designed electrical dehydration treating capacity and one-half cent (*40) per barrel of the aggregate designed electrical desalting treating capacity of said units for a period of eighteen (18) months in the manner following:
(a) Ninety-one Thousand Two Hundred Fifty Dollars ($91,250.00) upon the execution and delivery of this Agreement;
*127 (b) Ninety-one Thousand Two Hundred Fifty Dollars ($91,250.00) when operation involving the processes, or either of them, is begun; and
(c) Ninety-one Thousand Two Hundred Fifty Dollars ($91,250.00) six months after the date on which operation involving the processes, or either of them, was begun.
Third : Petrolite hereby grants to the Government an option to continue operation beyond the aforementioned eighteen (18) months period, with or. without notice to petrolite, for any extended period within the duration of the hostilities in which the United States is presently engaged and of Lend-Lease operations following the cessation of such hostilities. Operation subsequent to the expiration of the aforementioned eighteen (18) months period shall be deemed to be an exercise of the option. For such subsequent operation the Government shall and hereby agrees to pay to petrolite monthly for each month or part thereof the sum of Fifteen Thousand Two Hundred Eight and 33/100 Dollars ($15,208.33); provided, however, that when the total payments theretofore made hereunder shall aggregate five cents (5‡) per barrel of the aggregate designed annual electrical dehydration treating capacity and five cents (5$) per barrel of the aggregate designed annual electrical desalting treating capacity of said units, the Government shall be deemed to have acquired a paid-up license with respect to said units and the use thereof in the U. S. S. E., as herein licensed, and no further payments shall become due with respect to the use in the U. S. S. E. as herein licensed, of the said units.
Fourth: Subject to the provisions of Section eieth hereof and without relieving the Government from any obligation therein referred to, the Government shall be relieved from the obligation to make all payments specified in Sections second and third hereof except those then _ due, and the license granted herein shall be terminated if
(1) (a) The units covered by this Agreement have been destroyed; or
(b) The operation thereof under Lend-Lease has been terminated; and
(2) The Government shall so notify petrolite by delivery of a written notice by registered mail.
Fefth : Nothing shall waive, limit or prejudice in any way the claims or rights which Petrolite shall have for other and additional compensation with respect to or as *128 a result of the delivery or other disposition by or for the GOVERNMENT of said equipment or units or the communication or other disposition by or for the Government of any information relating to the Petreco process of electrical dehydration or the Petreco process of electrical desalting, or to said equipment or units, or to the use or operation thereof, or with respect to or as a result of the use or operation after the termination of the license herein granted of said processes or either of them, or of any such information, or of any of said equipment or units, or with respect to or as a result of the use of said processes or either of them, or of any such information otherwise than in connection with the operation of said equipment and units, or with respect to or as a result of the use of said processes or of either of them or of any of such information, or the use or operation of any of said equipment or units otherwise than in accordance with the license herein granted, and petrolite reserves all rights it may now or hereafter have for such other and additional compensation at law or in equity and/or under Section 1 of the Lend-Lease Act and Article IV of the Mutual Aid Agreement between the Governments of the United States and of the U.S.S.N. dated June 11, 1942, and other terms and provisions of such Act and Agreement, and/or under any other law, act, agreement or treaty to which the Government is or may be subject or a party; provided, however, that nothing contained in this Section eieth shall entitle petrolite to payments for the use of the processes or either of them in said units hereinabove mentioned, to the extent herein licensed, computed at a rate in excess of the rates used to compute the payments specifically provided for herein.
22. This agreement was intended and understood by both the plaintiff and defendant to cover both the right to use the Petreco processes and the furnishing and use of the Petreco technical and process information.
The 18-month period provided in part Second of the agreement was based on the estimate of Treasury Procurement officers as to the remaining period of hostilities. Plaintiff and the Treasury Procurement officers well knew and understood that they could not predict whether the Second Protocol Petreco plants and equipment would be destroyed by enemy action, or what disposition might be made of them at the end of hostilities, whether in the way of continued *129 operation in the TJ. S. S. R.., transfer to some other foreign country, or return to the United States.
23. In July 1944, plaintiff was advised by the duly authorized officers and agents of Treasury Procurement that a Petreco dehydration plant and a Petreco desalting plant, having a designed electrical dehydration treating capacity of 20,000 barrels per day and a designed electrical desalting treating capacity of 20,000 barrels per day, were to be procured, constructed and operated under the authority of Requisition R-8888, issued by U. S. S. R. to defendant on March 14,1944, in the furtherance of the part of the Russian lend-lease refinery program known as the Third Protocol. These Petreco dehydration and desalting plants were to be added to and were to become a part of a particular petroleum refinery, Refinery No. 4, Nebetdag crude, which refinery had theretofore been authorized under the Second Protocol program, and which refinery was being expanded under the Third Protocol by providing additional refining units and the Petreco plants.
24. In subsequent negotiations and conferences plaintiff was further advised by Treasury Procurement officers that Refinery No. 4 was to be erected and operated at Krasnavodsk in a desert area on the eastern shore of the Caspian Sea, where no fresh water was available for use in a desalting plant. The plan was to obtain fresh water by distillation of water from the Caspian Sea. In the interest of reducing high distillation costs, defendant requested plaintiff to provide an electrical desalting plant and process requiring substantially less than the volume of water normally employed in electrical desalting. Prior to the Russian refinery program, plaintiff had conducted some research into the use of the same water more than once in the desalting of crude petroleum, but following the request from the defendant, conducted intensive research and built the first pilot plant ever to employ reuse of water in electrical desalting. The fundamental idea involved was to provide two steps or stages for the successive electrical reduction of the salt content of the crude petroleum. In the second stage, when the salt content of the crude had already been reduced by the first stage operation, fresh and unused water was mixed with the crude derived from the first stage operation, and the electrical *130 process employed to complete the salt reduction process. The water effluent from this second stage was then reused in the first stage when it was mixed with crude petroleum not previously subjected to the electrical desalting process. •
In the older and less efficient methods of desalting crude petroleum, either by use of chemicals to extract or water to wash out the salt, this concept of reuse or recycling of the chemicals or water had been employed for some years prior to the Russian refinery program, but never in any process of electrical desalting. The application of this idea of reuse of water in adaptation of the single-stage Petreco process of electrical desalting comprised substantial developments in the Petreco technical and process information, and plaintiff designed and proposed to defendant a new and unique Petreco process of electrical desalting, known as dual-stage counterflow electrical desalting, never used before in petroleum refining. This new plant and process required only one-third to one-fourth of the volume of water employed in the single stage process of electrical desalting, and is also more efficient in extracting salt and other impurities from crude petroleum.
25. By letter to plaintiff, dated July 8, 1944, the same Treasury Procurement officer who had executed the Second Protocol license agreement, set forth in findings 19 through 21, proposed an extension of the agreement, as follows:
The said program has now been expanded so as to require, among other things, an additional Petreco Unit of a designed capacity of 20,000 barrels per day. The Government desires to arrange for an extension of the aforementioned existing license agreement to cover the use of the said patented processes for such additional unit. It is assumed that your company will be agreeable to such an extension upon the same terms and conditions and upon the basis of the same rate of compensation or royalties as are provided in the existing agreement.
Please advise this office whether such a proposed extension agreement will meet with your approval, whereupon the same will be prepared by this office and transmitted to your company for execution.
By letter dated July 12, 1944, plaintiff acknowledged receipt of this proposal, and advised that the matter would *131 be considered by plaintiff’s officers at the first opportunity.
26. In October 1944 a conference was field between plaintiff and Treasury Procurement officers and representatives, at wfiich it was determined by defendant tfiat plaintiff would furnish in connection with Refinery No. 4 the new Petreco process of dual-stage counterflow electrical desalting, and the specially designed Petreco dehydration and desalting plant, together with the specially developed Petreco technical and process information. It was understood that plaintiff would submit for processing a proposal concerning the furnishing of equipment, and that later an agreement would be reached concerning compensation for use of the processes and for the technical and process information.
In the discussion concerning the license agreement, plaintiff orally advised defendant that it objected to the fact that the equipment under the Second Protocol had been placed on shipboard in mid-1943 and that over a year later, plaintiff had not been advised that the plants were in operation, nor paid the second installment under the Second Protocol license agreement, and requested that provisions be included in the Third Protocol license to avoid the inequities resulting from such circumstances. Plaintiff likewise requested that a greater rate of compensation be provided as to the dual-stage counterflow process, measured by one cent per barrel per day on the daily rated capacity of the dual-stage desalting plant, with the rate on the dehydration process to remain at one-half cent per barrel per day as in the Second Protocol license agreement. The defendant advised that the Third Protocol program was also a war urgency project, and that a directive required that the equipment be on shipboard by late summer or early fall of 1945. Plaintiff was orally assured that the license agreement would be satisfactorily negotiated.
No license agreement was ever executed between the parties concerning the Third Protocol project.
27. In reliance upon defendant’s assurance with respect to reasonable compensation, and with the understanding that reasonable compensation would be paid to it by defendant, plaintiff consented- that defendant could use the Petreco processes, including dual-stage counterflow electrical desalt *132 ing, and furnished to defendant the Petreco technical and process information necessary for the use of the processes.
28. Plaintiff submitted under date of November 17, 1944, its proposal concerning the supply of Petreco dehydration and Petreco desalting equipment to Treasury Procurement, acting by and through its duly designated and appointed agent, E. B. Badger & Sons Company. This proposal related to the supply to defendant of the Petreco dehydration and Petreco desalting equipment necessary for employment of the Petreco processes, including the process of dual-stage counterflow electrical desalting, in the Third Protocol petroleum refinery. The proposal was accepted by Treasury Procurement on January 17, 1945 and incorporated in a Treasury Procurement Purchase Order designated as No. 4H482 dated November 29, 1944, as amended by Revision No. 1, dated January 17, 1945. This purchase order and first revision were accepted and executed concurrently by plaintiff on January 17,1945. On July 5,1945, defendant’s Revisions Nos. 2, 3, 4 and 5, none of which are pertinent to the issues in these cases, were accepted by plaintiff. The proposal and the purchase order included 12 Petreco dehydration units and 16 Petreco desalting units, having a designed electrical dehydration treating capacity of 20,000 barrels per day and a designed dual-stage counterflow electrical desalting treating capacity of 20,000 barrels per day.
Article III of plaintiff’s proposal, as accepted by defendant, provided as follows:
This proposal does not include any rights to use the Petreco dehydrating and desalting processes, or any patent rights, licenses or inventions, patented or un-patented, relating thereto or to the equipment herein described, nor does this proposal include any engineering or technical data, information, instructions, or advice relating thereto, it being understood that Procurement Division, Treasury Department will make arrangements and provide compensation satisfactory to Petrolite for for the use of such processes, etc. with the above described equipment in the U. S. S. R., the engineering to be provided by Petrolite under this proposal being limited to the design and supply of the equipment herein described.
By the proposal and purchase order, as amended and accepted by the parties, it was agreed that the purchase price *133 of $200,121.12 included the furnishing of equipment and the necessary engineering, design, drawings and inspection of equipment, including the “Engineering for the design, specification and supply of the equipment” and the “Plans, flow sheets, erection drawings and foundation drawings of the equipment.”
By Article IY (f) of the purchase order, as amended and accepted by the parties, it was agreed that plaintiff furnish to defendant in writing general operating instructions for the equipment, the cost of preparing, furnishing and delivering of the instructions to be deemed a part of the purchase price for equipment and services. It was further provided in connection with this article as follows:
Providing, however, anything herein to the contrary notwithstanding, the provisions of this subdivision (f) operating instructions, shall not be effective or operative for any purpose whatsoever unless Treasury Department, Procurement Division, shall make arrangements and provide compensation satisfactory to Petrolite Corporation, Ltd. for the use of the processes, etc. with the above described equipment in the U. S. S. R. as provided in article m of the Proposal and no reduction of or deduction from the aforesaid lump sum price for equipment and services shall be made because such operating instructions are not delivered in the event above referred to agreement is not made.
No compensation has ever been paid to plaintiff by defendant for use of processes or process information in connection with the Third Protocol program, and no arrangements or agreements have been consummated to provide such compensation, and plaintiff has never delivered in writing any set of general operating instructions on the Third Protocol equipment.
29. Plaintiff furnished and delivered to defendant all of the equipment, material and supplies specified in both the Second and Third Protocol proposals and purchase orders and performed all obligations and fulfilled all agreements on its part to be performed and fulfilled thereunder. The equipment as designed and furnished by plaintiff was capable of processing crude petroleum under normal operating conditions at a rate 25 percent in excess of the specified capaci *134 ties. Plaintiff also made a full and complete disclosure of all Petreco technical and process information necessary for the design, construction, installation and operation of both the Second and Third Protocol Petreco plants and for the use of the Petreco processes, including the new process of dual-stage counterflow electrical desalting, furnishing to defendant pilot plant evaluations, analyses of crude stocks, detailed blueprints and design data, specifications, drawings, plans, flow sheets, erection and foundation drawings and instructions, information and advice respecting operating methods, techniques and controls.
Each of the plaintiff’s proposals in both the Second and Third Protocol programs, as accepted by defendant, contained in paragraph F of Article VTthe following provision:
It is understood that the specifications, engineering and design data and information, drawings, plans, flow sheets, erection drawings and foundation drawings of the equipment are of an exclusive or confidential nature, or contain data or information of an exclusive or confidential nature, and shall remain the property of Petro-lite, and any information derived therefrom or otherwise communicated to the Purchaser or to others in connection with this proposal, or any order resulting therefrom, shall be regarded by the Purchaser and by others as strictly confidential, and shall not, without the consent in writing of Petrolite, be disclosed to any third party or made use of by the Purchaser or by others, except in connection with the performance of this proposal or any order resulting from this proposal, and only in connection with the equipment described herein.
30. With respect to the Second Protocol proposals and purchase orders, defendant furnished all of the Petreco equipment specified therein to the U. S. S. It.
With respect to the Third Protocol proposal and purchase order, the evidence does not establish that the defendant ever furnished the Petreco equipment to the U. S. S. K.
With respect to the Second Protocol program, defendant furnished the Petreco technical and process information, including the drawings, blueprints, flow sheets and other data and information furnished by plaintiff, to the U. S. S. E. At the request of defendant, plaintiff provided various Eussian engineers and technicians with *135 complete and detailed instruction and training in the operation of Petreco equipment and use of Petreco processes, conducting a training and instruction program at refineries where Petreco dehydration and desalting equipment was in operation, and also in the defendant’s offices in New York City. The Russians evidenced great zeal in acquiring complete explanations and full information concerning the Petreco equipment, the Petreco processes, and the drawings, blueprints and flow sheets, and plaintiff provided them completely and in detail with all of the Petreco technical and process information. During this program, the Russian engineers and technicians made detailed written notes and memoranda. The information, drawings, and other data so furnished to the Russians were sufficient to enable the U. S. S. R. to construct, duplicate, install and operate Petreco plants, both the dehydration and the single-stage or dual-stage desalting equipment, without further aid or supervision. The same type of training program was also conducted by defendant with respect to all other phases of the refineries furnished under the Russian lend-lease program.
In the conferences and training program, defendant participated by and through engineer-employees of its appointed agent, E. B. Badger & Sons Company, and thereafter some of these Badger engineers were sent by the defendant to U. S. S. R. where they remained from October 12,1943, until their departure on December 19,1946. They counseled with Russian engineers engaged in the erection, installation and commencement of operations on the lend-lease refineries, including the Petreco plants.
31. Refinery No. 4, as furnished by defendant to the U. S. S. R. under the Second Protocol program, was equipped with a thermal cracking unit or units, and was constructed and placed in operation at Krasnavodsk in the U. S. S. R. In the design and erection of Refinery No. 4, appropriate space was left for installation and operation of the Petreco electrical dehydration plant and Petreco electrical desalting plant, which plants, together with Houdry catalytic cracking and treating equipment, were to be additions to this refinery under the Third Protocol program. About 25 percent in volume of Third Protocol equipment was delivered by defendant to the *136 U. S. S. R., and was seen in storage at Eefinery No. 4 by Badger engineers who were witnesses in the trial of these cases. The evidence does not establish that any Petreco equipment was included in this stored equipment. No erection, installation or construction of the additions to Eefinery No. 4, as contemplated under the Third Protocol program, had commenced by the time of the departure of the Badger engineers from Eussia.
32. Under the Eussian lend-lease refinery program, defendant never undertook to furnish refinery units at Eefinery No. 5 or Eefinery No. 6, as those refineries were pre-existing operations, but did furnish Petreco dehydration and desalting plants and equipment under the Second Protocol, as described in the pertinent purchase orders in finding 17. Badger engineers were never permitted to visit these refineries. They offered to aid in erection of Petreco plants there, but were told by the Eussians that erection and installation were proceeding satisfactorily, and no aid would be requested unless necessary. The Badger engineers were also informed by the Eussian officials that the U. S. S. E. had decided to divide and redesign each of the Eefinery No. 5 and Eefinery No. 6 Petreco plants, each of which had 12 units of dehydration equipment and 12 units of desalting equipment, each having a 20,000 barrel per day capacity. They advised that they would transfer and install half of the Petreco plant for Eefinery No. 5 and half of the Petreco plant for Eefinery No. 6 at Eefinery No. 1 and Eefinery No. 2 respectively, each half to have a capacity of 10,000 barrels per day.
Defendant had furnished Houdry catalytic cracking and treating units for both of the latter refineries under the Eus-sian lend-lease program, but not Petreco dehydration or desalting equipment, the plan having been to use thermal or chemical methods of dehydration and desalting in connection with those refineries. The Badger engineers counseled with the Eussian engineers concerning erection and installation of Petreco plants at Eefinery No. 1 and Eefinery No. 2.
Eefinery No. 1, including the Petreco plant, was completed and placed in operation before the departure of the Badger engineers. Construction of Eefinery No. 2 was in process but had been delayed because of a mistake in design due to mis *137 information originally furnished by the Russians as to water supply, and because of emphasis being placed on completion of other refineries. The Badger engineers were uncertain about having seen any Petreco plant or equipment at Refinery No. 2.
33. Refinery No. 3, as furnished by the defendant to the U. S. S. R. under the Second Protocol program, was equipped with a thermal cracking unit or units, and the Petreco desalting and dehydrating plant described in the pertinent purchase order in finding 17. This refinery was the first to be completed and placed in operation, with the commissioning ceremonies having taken place on August 10,1945.
34. The refineries at which the Second Protocol Petreco equipment was installed, or proposed to be installed, are located in the Second Baku and Emba regions of the U. S. S. R. From facts and circumstances known during and prior to "World War XI, it is reasonable to conclude that these regions have developed into the most important oil producing districts of the Soviet Union. The crude petroleum produced in these districts required dehydration and desalting for its efficient refining and use.
Yery difficult natural conditions, including lack of a supply of fresh water, existed in the desert areas where Refinery No. 4 and the Nebetdag oil fields were located east of the Caspian Sea. The only witness who testified concerning the natural conditions and potential of the Nebetdag oil fields was a prominent Russian geologist who had been employed by the U. S. S. R. in Russian and Siberian oil fields for a number of years prior to his capture by the German forces in 1942. He stated that he was sure that the Russians “cannot develop on the Nebetdag oil field refinery.” The refinery to which he made reference was a small refinery of a very old type, refining small amounts of petroleum, which had existed for some years prior to World War II some distance east of and inland from Refinery No. 4, which was located on the shores of the Caspian Sea.
With respect to the new Second Protocol refinery, Refinery No. 4, this witness stated that it was possible to develop that refinery, but that it was “not easy” because the lack of fresh water constituted a very difficult problem. He further *138 stated that the Nebetdag oil fields were very important to the IT. S. S. R. from the standpoint of production of crude petroleum, that production of the Nebetdag crude petroleum had been increasing both prior to and during World War II, and that it would increase even more thereafter.
In a conference held between plaintiff and defendant on October 23, 1944, concerning the question as to whether or not Petreco single-stage or dual-stage desalting equipment and processes should be supplied by defendant to the U. S. S. R. for use at Refinery No. 4 as part of the Third Protocol additions thereto, plaintiff stated that the dual-stage plant would cost about $100,000 more than the single-stage, but would be substantially more efficient in removal of salt. Thereupon a member of the Soviet Purchasing Commission stated that the difference was too small to permit him to agree to accept the single-stage system for the reason that Refinery No. 4 had a future of great scope, that new fields nearby would be developed in the course of the nest 10 to 15 years, that there was a strong probability that various crudes other than Nebetdag would be desalted at Refinery No. 4, and that the most efficient desalting system was needed, especially because catalytic cracking was to be used and the presence of salt would seriously shorten the life of the catalyst.
Like the crude petroleum produced in the Second Baku and Emba regions, where production potential was high and natural conditions were good, the crude petroleum from the Nebetdag oil fields required dehydration and desalting.
35. It is the general experience, reasonably to be expected, and probably the case in the Russian oil fields, that as the period of production from an oil field lengthens, its producing formations meet with the intrusion of increasing amounts of salt water which create progressively greater need for dehydration and desalting of the crude petroleum produced from such field.
36. The refineries and proceeses supplied by defendant to . the IT. S. S. R. under the Russian lend-lease refinery program were modern in all respects and included the most recent developments of the American petroleum industry, including the Houdry catalytic and cracking plant and process. Maximum reduction of water, salt, and other impurities in the *139 crude petroleum is essential to the efficient and successful operation of modern refineries and processes, and especially the Houdry plant and process. Salt and other impurities cause corrosion of piping, tanks, and other equipment and poison or seriously damage the catalyst, requiring complete shut-down of the refinery for major and extensive repairs and replacements, and resulting in substantial costs and also losses from interrupted operations.
While there were other means of dehydration and desalting of crude petroleum, such as use of chemicals, settling-tanks or thermal treatment, the Petreco plants and electrical processes were the best means known, and from a practical standpoint, constituted the only reasonable method available for use in dehydration and desalting operations in connection with the refineries furnished by defendant to the U. S. S. E.
37. In connection with the Second Protocol program, defendant furnished to the IT. S. S. E. complete plans, specifications, drawings, flow sheets, technical data, know-how, and production technique with respect to the Houdry catalytic cracking and treating plant and process, as well as the Petreco electrical dehydration and electrical single-stage and dual-stage desalting plants and processes. The Eussian engineers and technicians with this information in hand were capable of completing and placing in operation those refineries and Petreco plants remaining to be installed or completed at the time of the departure of the Badger engineers, and were capable of constructing and placing in operation the proposed additions to Eefinery No. 4 involving the Houdry catalytic cracking and treating plant, and the Pe-treco dehydration and dual-stage counterflow desalting plant.
38. The design of the Petreco plants under both the Second and Third Protocol programs afforded means of dehydration and desalting of a variety of crude oils with differing characteristics, and the U. S. S. E. was provided by the defendant through the plaintiff with complete information respecting the use and adaptation of the Petreco equipment and processes in the treatment of different types of crude oils under changed operating conditions.
39. The Petreco dehydration and the Petreco desalting-equipment procured by defendant and delivered by it to the *140 U. S. S. R. bad a useful life of about 15 years, and the defendant furnished to the U. S. S. R. a generous complement of spare parts for all units of the equipment. Russian oil refineries are equipped with foundry and machine shop facilities for the fabrication and replacement of parts and pieces of plant and equipment as may be necessary for continuing refinery operation and maintenance.
40. The requirements of the U. S. S. R. for petroleum refineries and dehydration and desalting plants were greatly in excess of the plant and equipment furnished or proposed to be furnished to the U. S. S. R. by the defendant under the Second and Third Protocol programs.
41. Plaintiff has performed all obligations and fulfilled all agreements on its part to be performed and fulfilled under the Second Protocol license agreement, dated May 28, 1943, set forth in findings 19 through 21.
The initial payment as provided in article Second of this agreement in the sum of $91,250 was made by the defendant to the plaintiff on or about July 14,1943. Operation of the Petreco processes having commenced in Russia on or about August 10, 1945, payment by the defendant of the sum of $182,500, the balance due under the remaining two installments, provided in article Second, was made to plaintiff on or about July 13,1946. These payments were applicable to operations for the period from August 10,1945, to February 10,1947.
No other payments have been made by defendant to plaintiff under this Second Protocol license agreement.
42. By telegram transmitted February 10,1947, the Bureau of Federal Supply, as successor agency of Treasury Procurement, advised plaintiff with respect to the Second Protocol license agreement, as follows:
State Department has requested this office to inform you that the United States will not exercise the option in contract DA-TPS-35692 beyond February 10, 1947. Russian Government being advised by State Department that use of process after February 10, 1947 will make Russians liable for payment of royalties to your corporation and have requested Russians to make payment to *141 your corporation of such royalties as may become due by reason of continued use of equipment. Letter follows.
By letter dated March 3,1947, the defendant’s Lend-Lease Administrator advised plaintiff as follows:
This is to supplement the telegram dated February 10, 1947, addressed to you by the Bureau of Federal Supply, and signed by Mr. J. D. Tompkins. On February 10, 1947, the Department of State, Office of Foreign Liquidation Commissioner, over the signature of Mr. William C. Moore, Acting Director, USSR Division, wrote to Mr. I. A. Eremin, Acting Chairman of the Soviet Government Purchasing Commission, with reference to certain license agreements entered into in connection with the Russian lend-lease oil refineries. On February 13, 1947,1 wrote a letter to I. A. Eremin indicating that the letter of February 10 was signed .by Mr. Moore in my absence, but with my approval, and confirming that the letter signed by Mr. Moore represented my position on the matter.
Specific reference to your contract is made in Mr. Moore’s letter. It states that, in the case of Contract DA-TPS-35692 between the United States Government and Petrolite, the 18 months period of use of the processes for which the United States Government contracted expires on February 10,1947, and that the United States Government elects not to avail itself of the option to continue use of the processes thereafter. The letter goes on to say that, if the Soviet Government makes further use of the processes involved, it will thereby become liable to pay directly to your corporation whatever royalties may become due by reason of such use. It then presents a formal request to the Soviet Government to make directly to you such payments as it may become liable to make under the circumstances outlined above.
We were advised some time ago by the Soviet Government that an oil mission would shortly visit the United States to make License agreements for oil refining processes on behalf of the Soviet Government. The Department of State will be glad to assist you in every way possible in contacting the Soviet oil mission when they arrive and in negotiating satisfactory arrangements to protect your interest in this matter.
By letter dated March 6,1947, plaintiff replied to defendant’s Lend-Lease Administrator, and stated that it had not *142 been able to reconcile defendant’s position stated in the foregoing telegram and letter with the provisions of the Second Protocol license agreement.
43. The defendant and the U. S. S. R. have never reached a lend-kase settlement agreement. Under Article V of the Mutual Aid Agreement of June 11, 1942, the defendant retains a lend-lease title, that is, the right to require the U. S. S. R. to return the Petreco plants and equipment, and no transfer of title has ever been made to the U. S. S. R.
The defendant has repeatedly requested the U. S. S. R. to provide compensation to the plaintiff for use of the Petreco plants and processes, and secured commitments from the U. S. S. E. to negotiate with plaintiff and other process owners. Expressly reserving its position that the defendant was obligated to pay full compensation for the continued use in the U. S. S. E. of the Petreco plants and processes, plaintiff at the request of defendant has unsuccessfully negotiated with representatives of the U. S. S. E. for payment of such compensation.
44. Although there was no provision in the pertinent proposal and purchase order prohibiting shipment until a license agreement had been reached, plaintiff repeatedly requested that until the defendant had provided compensation for use of plant and process, the defendant not make delivery to the U. S. S. E. of the Third Protocol plant and equipment. Acknowledging that a very minor part had already been delivered, defendant advised both plaintiff and the U. S. S. E. that this Petreco plant and equipment would not be delivered until the U. S. S. E. had made satisfactory arrangements to pay plaintiff such compensation.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petitions are dismissed.